Mehdi MASHI, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 78–2359
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Dec. 11, 1978.

---

* Rule 18, 5 Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

Sauer & Hormachea, Nancy Hormachea, Houston, Tex., for petitioner.

Griffin B. Bell, Atty. Gen., Philip Wilens, Chief Government Reg. and Labor Section, Eric Fisher, James P. Morris, U.S. Dept. of Justice, Washington, D.C., for respondent.

Paul O'Neill, Dist. Director, Immigration and Naturalization Service, Houston, Tex., Troy Adams, Jr., Dist. Director, Immigration and Naturalization Service, New Orleans, La., for other interested parties.

Before GOLDBERG, AINSWORTH and HILL, Circuit Judges.

GOLDBERG, Circuit Judge:

In this deportation proceeding the immigration judge and the Board of Immigration Appeals found the petitioner deportable for failure to comply with the conditions of his nonimmigrant student status. The judge and the Board found this failure a violation of 8 C.F.R. § 214.2(f)(1a) and section 101(a)(15)(F)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(F)(i), and grounds for deportation under section 241(a)(9) of the Act, 8 U.S.C. § 1251(a)(9). The judge, and the Board on appeal, both issued orders granting the petitioner an opportunity to depart the United States voluntarily and further ordered the deportation of the petitioner if he failed to leave the country voluntarily in the time allotted. The petitioner appealed the Board's departure and deportation order to this court.

We reverse the Board's ruling in this case and vacate its order requiring the departure or deportation of the petitioner.

The facts of this case are as follows. The petitioner, a native and citizen of Iran, entered the United States on or about November 21, 1975 as an alien nonimmigrant student. At the time of his entry, the petitioner had been authorized to attend Galveston College in Galveston, Texas by the college itself and by the Immigration and Naturalization Service, in accordance with 8 C.F.R. § 214.2(F)(2). The petitioner subsequently enrolled at Galveston College, and registered for 12 credits of course work for the spring, 1976 semester starting in January, 1976. Following that semester he attended two consecutive terms of summer school at Galveston College. By the fall of 1976, he had earned nineteen credits and grades of two C's, one B, and three A's.

In the fall of 1976, when the semester in controversy in this proceeding began, the petitioner registered for another fourteen credits. Midway through the semester, on November 9, 1976, the petitioner participated in a political demonstration in Houston and was arrested, along with 90 other Iranian students, for demonstrating without a permit (Record p. 6).[1] The charge was a misdemeanor punishable by a $100 fine but not by imprisonment. (Record p. 4.) A bond was required by the Police Department in Houston in the amount of $27.50, which the petitioner was apparently prepared to post. (Record p. 7.) However, at that time the Immigration and Naturalization Service placed a "hold" order on the petitioner. As a result, the petitioner was kept in jail for about 12 days.[2]

During this "hold" incarceration, imposed because the INS demanded it, the petitioner missed, among other classes in other courses, a total of six classes and one exam in his four credit Physics course. (Record p. 43.) When he returned to school, petitioner went to see his Physics professor, who counseled him that it would be to his advantage to drop the course. (Id.) The petitioner voluntarily withdrew from the Physics course in late November, 1976.

On December 16, 1976, the INS issued an Order to Show Cause requiring the petitioner to show why he should not be deported for being enrolled in only 10 credits of course work. (Record p. 61.)

1. Although the Board stated that the petitioner was arrested for disorderly conduct, this is not mentioned in the opinion by the immigration judge or in the record. During oral argument before the Board it was uncontested that the petitioner had been arrested for demonstrating without a permit. (Record p. 6.) In any case, there is no dispute that the arrest was a misdemeanor related to a political demonstration and was punishable by fine and not by imprisonment.

2. The propriety of this "hold" order is discussed *infra* at p. 1315.

■ The Board decided that the petitioner should be deported from this country because, by completing only 10 credits in his fall, 1976 semester, he was not "comply[ing] with the conditions" of his student status, as required by section 241(a)(9) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(9). The "conditions" of the petitioner's student status, as set by section 101(a)(15)(F)(i) of the Act, 8 U.S.C. § 1101(a)(15)(F)(i), are that he "pursue a full course of study" in this country. The Board defines "full course of study" by looking to 8 C.F.R. § 214.2(f)(1a)(ii), which specifies that a full undergraduate course of study must "consist of at least 12 hours of instruction a week, or its equivalent." A closer reading of 8 C.F.R. § 214.2(f)(1a) shows that the "12 credit" limit in § 214.2(f)(1a)(ii) does not apply to the petitioner in this case. The petitioner entered the United States on or about November 21, 1975 as an alien nonimmigrant student; both the immigration judge (Record p. 58) and the Board (Record p. 1A) found this as a fact. And yet the "12 credit" rule in 8 C.F.R. § 214.2(f)(1a) was added to the regulations by amendment in 1975[3] and does not apply to aliens admitted to the United States as nonimmigrant students before January 1, 1976.[4]

On this point the regulations are quite explicit:

A nonimmigrant admitted to the United States prior to January 1, 1976 under section 101(a)(15)(F)(i) of the Act . ., notwithstanding that he may not be taking a full course of study as defined in this subsection [i. e. a twelve hour schedule] may continue in that nonimmigrant classification until he completes the course of study at the school he was authorized to attend prior to that date: provided he continues to carry not less than what the school considered to be a full course of study prior to January 1, 1976, and he otherwise continues to maintain student status.

8 C.F.R. § 214.2(f)(1a).

Since the petitioner was "admitted to the United States prior to January 1, 1976" under the nonimmigrant student classification, it is clear this sentence, rather than the 12 credit rule in § 214.2(f)(1a)(ii), controls his case. It follows that the Board erred when it ordered the petitioner deported simply because his course load briefly dropped below twelve credits.

■ Instead, the regulation only requires that he 1) carry not less than what the school considered to be a full course of study prior to January 1, 1976, and 2) otherwise maintain student status.

There is no evidence in this record to indicate that Galveston College was not completely satisfied with the petitioner's

---

3. The "12 credit" minimum requirement has a curious roller-coaster history in U.S. immigration law. The Immigration and Nationality Act of 1924 did not set out academic standards for alien students. See S.Rep. 1515, 81st Cong., 2d Sess., 479. A Department of Labor regulation required only that the student not fail, neglect, or refuse "regularly to attend" school, or otherwise fail, neglect, or refuse to "maintain the status of a bona fide student." See *Ex parte Tsiang Hsi Tseng*, 24 F.2d 213 (N.D.Calif., S.D. February 8, 1928). Eventually the State Department enacted a regulation pursuant to the 1924 Act requiring "a minimum of 12 semester hours" for alien undergraduate students in this country. See S.Rep. 1515, 81st Cong., 2d Sess., 479–80. But this regulation, and the 1924 Act, were superseded by the Immigration and Nationality Act of 1952, which is the operative law today. Regulations enacted pursuant to the 1952 Act originally did not prescribe any minimum number of semester hours and did

not elaborate the statutory requirement that the student must pursue "a full course of study." *See* Gordon and Rosenfield, *Immigration Law and Procedure*, Section 2.12a (1977). That elaboration was not provided until 1975, when the regulations were amended to reincorporate the 12 credit minimum, applicable to student status acquired after December 31, 1975. 8 C.F.R. § 214.2(f)(1a).

4. Perhaps surprisingly, none of the participants in these proceedings caught this critical oversight. But in fairness to all involved, we note that this petitioner was only one of many aliens arrested and processed in this episode, and that the adjudications appeared to proceed more in assembly-line fashion than on a painstakingly detailed case-by-case basis. Thus it is likely that this particular detail, while significant in the petitioner's case, was not relevant in many of the other cases.

course of study, especially taking into account his efforts to supplement his regular year curriculum with the school's own fully accredited summer session courses.

Moreover, under 8 C.F.R. § 214.3(g) Galveston College has an affirmative duty to report immediately to the INS when a nonimmigrant student "fails to carry a full course of study as defined in § 214.2(f)(1a), [or] fails to attend classes to the extent normally required. . . ." The petitioner asserts (Petitioner's brief p. 9) and the INS concedes (Respondent's brief p. 12) that Galveston never so reported to the INS concerning the petitioner.

As for the second prong of the § 214.2(f)(1a) test—whether the petitioner "otherwise maintain[ed] [his] student status"—the INS all but concedes this,[5] and for good reason.

The facts in this case show that the petitioner actually is pursuing a full course of study at his college in a far more diligent and conscientious manner than is required by the Immigration and Nationality Act and by INS regulations. Between the time of the petitioner's entry into the United States in November, 1975, and his deportation hearing in February, 1977, even the newer INS regulations—which, as explained above, are stricter than those applicable to this student—would require the student to take only thirty-six credits. Instead the petitioner enrolled in fifty-four, and by the time of his hearing, had successfully completed or maintained a total of forty-three. (Record p. 64.) Moreover, at the time the INS issued its Order to Show Cause, the petitioner was averaging seven-

teen credits per semester *required* by INS regulations, as opposed to the twelve credit amount required by the new INS regulations. In addition, he was averaging a B + grade average. One key to the petitioner's ability to maintain his student status in spite of his obvious difficulties with the English language, was his willingness to attend both summer sessions at Galveston College. The I&N Act and INS regulations do not require a nonimmigrant student to attend school during the summer vacation period.[6]

We can see no reason why a student who attends school full-time 12 months a year, albeit with some academic pratfalls along the way, is deportable because he is not "pursuing" a course of study as fully as an abler student who can accumulate the same number of credits in only two semesters a year.

Of course this is not to say that any alien nonimmigrant student who registers for, or even accumulates, 24 credits a year in any manner he wishes would necessarily meet the requirements of 8 C.F.R. § 214.2(f)(1a). For example, a student who deliberately compressed his year's academic work into a single semester so that he could hold a job or be a tourist the rest of the year might not be considered pursuing a full course of study in the manner intended by Congress. Similarly, a student would not be permitted to abandon his studies the second day of each semester. But these are certainly not the situation in this case. A court must view the entirety of a student's academic efforts in a fair and reasonable manner consonant with the intent of Con-

---

**5.** In its brief the INS stated:

Petitioner appears to argue that he has not failed to "maintain his student status" by completing only 10 hours of instruction. However, as the Order to Show Cause reads, he was charged under Section 241(a)(9) of the Act, 8 U.S.C. 1251(a)(9) with a failure "to comply with the conditions of" his status, not the failure to "maintain" the status. As those conditions are set forth as being the pursuit of a "full course of study," 8 U.S.C. 1101(a)(15)(F)(i), defined as "at least 12 hours of instructions a week," 8 C.F.R. 212.2(8)(1a), *it is irrelevant that he may actually*

be maintaining his status as a bona fide student. He has failed to comply with the conditions of that status and, therefore, was correctly found deportable.

(Emphasis added.) (Respondent's brief p. 10 n. 7.) (See also Respondent's brief, p. 11.) (Note: The government's cite to 8 C.F.R. 212.2(8)(1a) is incorrect, as there is no such section in the Code of Federal Regulations. Most likely the INS meant to cite 8 C.F.R. 214.2(f)(1a).)

**6.** Indeed, the regulations allow full-time employment during this period. *See* 8 C.F.R. § 214.2(f)(6) and Gordon, n. 3 *supra*, at § 2.12e, 2–96.

gress and the dictates of judicial and administrative case law, and sensitive to the realities and "various handicaps" of the foreign student. *See Ex parte Tsiang Hsi Tseng*, 24 F.2d 213 (N.D.Calif., 1928). See pp. 1315–1317 *infra*.

The Board's narrow, unrealistic, and unduly harsh approach is exacerbated by the illogical distinction it seems to perceive between flunking a course and dropping it near the end of a semester.

■ According to the Board, the petitioner sealed his exit visa fate by dropping his Physics course. At that point, he was no longer "pursuing" 12 credits. Of course it is inconceivable that the Board would read 8 C.F.R. § 214.2(f)(1a) as calling for the deportation of an alien simply because he failed to receive a passing grade in one of his courses. Such an application of the law would contradict the plain meaning of 8 U.S.C. § 1101(a)(15)(F)(i) and especially its key word "pursue."

Thus, apparently the Board would say that the petitioner would not have violated his status, and would have escaped deportation, if he had simply "pursued" his Physics credits to the end of the semester. The Board leaves us, then, with the illogical and unrealistic distinction between dropping a course shortly before the end of the semester [7] to avoid a failing grade, and continuing with the course futilely to the end. The law does not require a person to do a vain and empty thing, and Congress could not have intended such with this legislation.

The decision of the Board turns almost exclusively [8] on the fact that the petitioner was enrolled in only 10 credits on December 16, 1976, the day before the end of his fall term. The Board attaches little or no significance to the fact that this petitioner carried fourteen credits up until the last few weeks of that fall term. The Board attaches little significance to the fact that the petitioner had enrolled in more than 12 credits every semester since entering the United States, including the semester in controversy. It attaches no significance to the fact that the petitioner attended two sessions of school that were not required by INS regulations during his summer vacation. The Board does not even acknowledge that on the date of the Show Cause Order the petitioner was accumulating credits far faster than required by INS regulations.

■ In effect, the Board has read a penalty clause into INS regulations and section 101(a)(15)(F)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(F)(i). The purpose of this section of the act was to foster "cultural interchanges" [9] because "of the importance assigned to the interchange of students under foreign policy and . . . the benefits from the pursuit of such policy." S.Rep. 1515, 81st Cong., 2d Sess., 509.

The I&N Act was not designed to allow foreign students to visit this country at great personal expense to themselves [10] and then deport them in the middle of a diligent and successful college career because they are forced to drop one course the final

---

7. Here the key finding was that the petitioner had dropped his course by the time of the issuance of the Order to Show Cause, which was December 16, 1976. Since the semester ended on December 17, 1976 (Record p. 63), the cause for deportation apparently could be as trivial as missing one day of classes.

8. The Board's error in this case was not simply one of focussing on a single slightly ill tree to the exclusion of the surrounding lush forest. The Board's vision was unfairly selective, not just unfairly narrow. It noted with great disfavor the petitioner's academic problems, due to his struggle with the English language, during his first semester at Galveston College. But the board made no mention at all of the fact that the petitioner diligently worked to over-

come these early problems and to maintain his full student status by attending both sessions of Galveston's summer school.

9. Gordon and Rosenfield, at § 2.12a, 2–83. They wrote:

In classifying the alien student as a nonimmigrant in the early 1950's, "Congress recognized the importance of cultural interchanges and disclaimed any intention of hindering aliens who wished to come to the United States to pursue bona fide courses of study."

10. The petitioner was paying his full way and received no financial aid from Galveston College. (Record p. 49.)

weeks of one semester. Such an interpretation of the Act would not seem to foster cultural interchange or serve our foreign policy. Moreover, the twelve credit rule in 8 C.F.R. § 214.2(f)(1a) can not be applied so arbitrarily and so abusively. A fortiori, the INS, on these facts, cannot deport this student on the ground that he is not maintaining his student status, as is required by the sentence in 8 C.F.R. § 214.2(f)(1a) which does apply to him.

■ Related to the Board's error here is its finding that "[t]he incarceration which resulted from the disorderly conduct was inconsistent with the purpose for which he was admitted. This, too, constitutes a violation of the nonimmigrant student status where such incarceration meaningfully interrupted the pursuit of his academic studies." But In Matter of Murat-Khan, 14 I&N Dec. 465 (BIA 1973) the Board held that a nonimmigrant student's conviction for the offense of residing where drug laws are violated, and the resultant 20-day incarceration, did not constitute a failure to maintain her nonimmigrant student status. The court in Murat-Khan found that the student's incarceration did not "meaningfully disrupt the pursuit of her studies." 14 I&N Dec. 465, 466. As we have just indicated, it is difficult to see how petitioner's 12-day incarceration and subsequent withdrawal from one course, given the surplus of credits he accumulated the summer before, constituted a "meaningful disruption" of his college career. But in addition, in Murat-Khan the alien was jailed as punishment for a crime, imposed after due process of law. Petitioner in the instant case was arrested for a crime for which he could not legally be imprisoned. His incarceration was entirely the result of the INS's ex parte "hold" order.[11] Were it not for the INS order, the petitioner's arrest and even a conviction would not have been grounds for deporting him. Matter of C—, 9 I&N Dec. 100 (BIA 1960) (conviction for disorderly conduct, not resulting in incarceration, did not constitute violation of the alien's nonimmigrant student status). Thus, what minor disruption did occur was caused by the INS's own action in having the petitioner "held" for twelve days without a hearing or due process of any kind.[12] The INS itself has apparently repudiated the practice of placing "holds" on aliens in petitioner's position.[13]

In view of these facts, the Board's conclusion that "[t]here is no showing that the Service engaged in conduct which led the respondent to a course of action which he would not otherwise have taken or led him to change his situation in any way, whether to his detriment or otherwise," (Record pp. 2–3) is clearly incorrect.

Led by the U.S. Supreme Court, the federal courts have established a pro-alien, anti-deportation policy of statutory interpretation responsive to Congress's intent to encourage "cultural interchange."

Thus, in Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948) the Supreme Court interpreted a de-

---

11. While the petitioner may have given a false name to police, the police were prepared to release him on the $27.50 bond he was prepared to pay. Instead the petitioner was incarcerated for at least twelve days due to a "hold" issued by the INS without a hearing or due process of any kind. In fact, it appears the INS did not even interview the petitioner during the entire twelve day incarceration. This is especially significant given that those students who were interviewed by the INS as early as the third day of the incarceration apparently gave their correct names during the interviews.

12. The petitioner was caught in a difficult position. The INS had the petitioner held while it investigated whether his student status was being maintained. When it released him twelve days later it effectively contended that he had failed to maintain his status by being in jail for twelve days. The contention is not unlike saying an alien violates his status by being investigated for violating his status.

13. During oral argument before the Board of Immigration Appeals, counsel for the petitioner asked the Board to take administrative notice of the fact that on December 16, 1976, the Deputy Immigration Commissioner, James Green, "set down instructions to the Service stating this kind of arrest was improper, and the practice of placing holds against aliens in this situation was not to be maintained." (Record p. 26.) INS counsel did not contradict this statement.

portation statute in a pro-alien manner, explaining as follows:

> We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, *Delgadillo v. Carmichael,* 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

The Second Circuit, in *Lennon v. I.N.S.,* 527 F.2d 187, 193 (2d Cir. 1975), (Kaufman, C. J.) cited *Fong Haw Tan* and stated:

> It is settled doctrine that deportation statutes must be construed in favor of the alien. . . .

> Deportation is not, of course, a penal sanction. But in severity it surpasses all but the most Draconian criminal penalties. We therefore cannot deem wholly irrelevant the long unbroken tradition of the criminal law that harsh sanctions should not be imposed where moral culpability is lacking.

And in *Marino v. INS,* 537 F.2d 686, 691 (2d Cir. 1976), the Second Circuit, citing *Lennon* and *Fong Haw Tan,* again explained that "specific rules of statutory interpretation have evolved in the immigration context . . . [and] '[i]t is settled doctrine that deportation statutes must be construed in favor of the alien.'" The *Marino* court held that a statute providing for deportation for aliens with a "final conviction" must be read as requiring "a *substantial* degree of finality." (emphasis added.) *Id.*

Finally, in *Ex parte Tsiang Hsi Tseng,* 24 F.2d 213 (N.D.Calif., 1928), the court held that an alien did not fail to maintain his status as a bona fide student, and thus was not deportable, when he received a two month leave from his college to work voluntarily and full-time on a newspaper from November 1926, to January, 1927, and then was forced, due to illness and his college's strict regulations concerning illness leaves, to drop out of school in March, 1927, for 10 months before being readmitted in January, 1928.[14]

The court wrote:

> If a foreign student is disqualified for poor scholarship, and hence must seek a new institution, or drops out temporarily on account of illness, and loses the part of a regular term, he cannot be said on that account alone to lose his student status. Where all of the undisputed evidence shows constant and consistent efforts on the part of the student to continue his studies he does not "fail, refuse, or neglect" to maintain his status. It must be remembered that foreign students in this country suffer from various handicaps. They are in unfamiliar surroundings. The language in which classes are conducted is strange to them. The rule cannot be construed to require them to do more than in good faith to try to continue their studies until they either complete them to their own satisfaction or confess defeat.

*Id.* at 214.

Even the INS itself normally employs a more flexible approach than that used in the instant case.

In describing INS practice and policy, the *Immigration Law and Procedure* (1977) treatise by Gordon and Rosenfield, the leading treatise in this field, and the only one cited by the INS in its brief, states:

**14.** The INS attempted to distinguish *Tseng* because it involved a regulation requiring only that the alien "maintain the status of a bona fide student," as opposed to the specific 12 credit minimum which the INS thought controlling in the instant case. (Respondent's brief, p. 11). This attempt boomerangs. As we have said, the Service misread the regulation, see pp. 1312, *supra,* which in fact does not require this petitioner to take twelve hours a week but says only that he must maintain his student status. And this is precisely the standard that was used in *Tseng.*

"However, students who have quit school and are found out of status often are permitted to resume their student status, if a bona fide desire to complete their studies is demonstrated."

*Id.* at § 4.9, 4–87 n. 17.

And in the *Matter of Neely and Whaylie,* I&N Dec. 864, 865 (BIA 1966), the Board wrote:

> In the absence of a definition, by statute or regulations, of acts which constitute a violation of nonimmigrant status, each case must be looked into on its own facts, and the decision arrived at should strike a fair balance between the character of the act committed and the consequences which will flow from it.

▉ In the instant case the Board argues that regulations do define "acts which constitute a violation of nonimmigrant status," but as we have said this position is clearly incorrect insofar as the Board mistakenly applies the twelve credit rule to students governed by an earlier, less specific regulation. But even with the twelve credit rule, it is hardly the case that the regulations "define" a student's act of dropping a single course and momentarily dipping below the twelve credit minimum as noncompliance with the conditions of his student status, which conditions were defined in the act simply as the pursuit of a full course of study. The twelve credit rule can not be applied in a de minimis penalty clause manner because Congress and the federal courts have established that this is contrary to the purpose and meaning of the Immigration and Nationality Act.[15] The Board's interpretation of the phrase "comply with the conditions" is contrary to even conventional rules of statutory interpretation but it is especially inappropriate in this area where the settled rule is a broad, pro-alien approach. We are confident that in the future the INS will continue to apply the test it adopted in *Neely*—looking into each case on its own facts, and deciding by striking a fair balance between the character of the act committed and the consequences which will flow from it.

Of course, we recognize a need for specific and detailed regulations which should guide and control the practices of the INS and foreign visitors to this country. For example, a rule stating that an alien should carry an identification card at all times is certainly a reasonable and worthwhile regulation. But this is quite different from saying that the "compliance" clause of a deportation regulation incorporates it and every other technical regulation in the Code of Federal Regulations on a per se penalty clause basis. It is true that during brief periods of time, because of academic and other difficulties, the petitioner did slip below the twelve credit level. But it is also true, and far more significant, that through his above average effort and diligence, the petitioner was attending school full-time, twelve months a year, and accumulating credits at a pace far in excess of even the new twelve credit regulation. A fortiori this petitioner is not deportable under the less specific test applicable to him, according to 8 C.F.R. § 214.2(f)(1a). Moreover, deportation of this petitioner is not justifiable under Section 241(a)(9) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(9) and section 101(a)(15)(F)(i) of the Act, 8 U.S.C. § 1101(a)(15)(F)(i), which authorize deportation only when an alien is not complying with the conditions of his status, which conditions are pursuit of a full course of study.

In summary, we find the Board of Immigration Appeals applied the wrong law in this case, made factual findings unsupported in the record, and abused its discretion in ordering the deportation of the petitioner. The Board's departure and deportation order is vacated and its judgment is reversed.

REVERSED and VACATED.

---

15. Similarly, we reject the Board's assertion that the petitioner could have been deported for simply not carrying his I–94 identification papers on a single occasion.