Mehrzad and Fariba SHAMSIAN,
Plaintiffs,

v.

David N. ILCHERT, District Director,
Immigration and Naturalization
Service, Defendant.

Farzaneh and Zabiholah SADIGATFAR,
Plaintiffs,

v.

David N. ILCHERT, District Director,
Immigration and Naturalization
Service, Defendant.

Afsaneh BAGHAYI, Plaintiff,

v.

David N. ILCHERT, District Director,
Immigration and Naturalization
Service, Defendant.

Nahid SHAHAMIRI, Plaintiff,

v.

David N. ILCHERT, District Director,
Immigration and Naturalization
Service, Defendant.

Nos. C-80-2808 RHS, C-80-2809 RHS,
C-80-4244 RHS and C-80-4344 RHS.

United States District Court,
N. D. California.

Jan. 12, 1982.

Donald L. Unger, Simmons & Unger, Terry J. Helbush, Dana M. Keener, San Francisco, Cal., for plaintiffs.

Richard de St. Phalle, Asst. U. S. Atty., Dept. of Justice, San Francisco, Cal., for defendant.

## OPINION

SCHNACKE, District Judge.

Plaintiffs are Iranian nationals whose applications for extensions of stay as non-im-

migrants, and for change of status, were denied during the "hostage crisis". They seek declaratory relief, challenging the exercise of discretion by the District Director of the Immigration and Naturalization Service (hereinafter, "INS") and the constitutional validity of the federal regulations upon which it was based. Of central concern is the authority of INS to consider United States foreign relations in carrying out its responsibility under the immigration laws.

All cases are related within Local Rule 205–2. Defendant moves to dismiss. Sadigatfar and Shamsian move for summary judgment. Under F.R.Civ.P., Rule 12(b), defendant's motions to dismiss shall be treated as motions for summary judgment. There is no material issue of fact. Defendant is entitled to judgment as a matter of law.

### Facts

Baghayi and Shahamiri are Iranian nationals admitted to the United States temporarily as "non-immigrant students". Baghayi entered on August 18, 1978, and was authorized to stay until August 17, 1979. Shahamiri entered September 10, 1978, and was authorized to stay until September 9, 1979. Baghayi submitted an application for extension of stay (Form I–538) in July 1979; it was returned to her as insufficient. A sufficient application was not made until November 23, 1979, after she exceeded her stay. Shahamiri applied for an extension on October 7, 1979, and thus, also was out of status at the time of her application.

Mehrzad and Fariba Shamsian (hereinafter, "Shamsians") were admitted temporarily as "non-immigrant treaty investors" and authorized to stay until January 20, 1980. Farzaneh and Zabiholah Sadigatfar (hereinafter, "Sadigatfars") were admitted temporarily as "non-immigrant visitors for pleasure," but filed for adjustment in status to permanent resident ("immigrant") status on January 20, 1977, under § 245 of the Immigration and Naturalization Act of 1952 (8 U.S.C. § 1255). They were immigrants subject to numerical quotas and were not members of one of the six classes given preference for permanent visas. Since there were no available visas for non-preference, non-immigrants, their applications could not be approved, and they were allowed to stay pending eventual assignment of a visa number.

Each applicant had reason to believe his or her application would be approved. But on November 4, 1979, the United States Embassy in Tehran was invaded, and American citizens were held hostage. There then began a series of severe restrictions against Iranians in an effort to secure prompt release of the hostages. The District Director of INS, relying on an amendment to 8 C.F.R. § 214.1(c)[1] and 8 C.F.R. § 245.1(d)[2] denied all plaintiffs' applications. Plaintiffs assert three claims: (1) the District Director should have granted their applications prior to the time the Iranian regulations were in effect; (2) the regulations in question were promulgated without proper authority and thus, constitutionally invalid; and (3) the continued application of regulations after the hostage crisis had ended denies them equal protection under the

---

1. The amendment to 8 C.F.R. § 214.1(c), effective April 11, 1980, provides: "C. Extension of Stay .... a non-immigrant alien who is an Iranian national is ineligible for extension of stay unless he fulfills at least one of the following two conditions: (1) he/she is in immediate need of urgent medical treatment which is available only in the United States or, (2) he/she has a relationship to a United States citizen or lawful permanent resident within the categories specified in § 201(b) or § 203(a)(1), (2), (4), or (5) of the Act. 45 Fed.Reg. 26015 (April 16, 1980). The regulation was further amended to add two additional exceptions not relevant here."

2. The amendment to 8 C.F.R. § 245.1, effective April 11, 1980, provides: "a non-immigrant alien who is an Iranian national is not eligible for the benefits of § 245 of the Act unless (1) he/she claims immediate relative status under § 201(b) or preference status under § 203(a)(1), (2), (4), or (5) of the Act and is also the beneficiary of a valid unexpired visa petition filed in accordance with Part 204 of this Chapter and approved to accord him/her such status, or (2) he/she has been granted asylum in the United States."

Constitution. The various claims shall be treated in that order.

## I.

**A.** Shahamiri and Baghayi, the Iranian students, first contend that the District Director's denial on December 5, 1979 of their applications was an abuse of discretion. Both Iranian students applied for extensions of their stay after they were out of status. As such, they violated the conditions of their stay, were in the United States unlawfully, and were deportable under 8 U.S.C. § 1251(a)(9). *Ghajar v. INS*, 652 F.2d 1347, 1348 (9th Cir. 1981).

The grant or denial of reinstatement or an extension of stay is within the discretion of the Attorney General and his delegate, the District Director. See, e.g., *Johns v. Dept. of Justice*, 653 F.2d 884 (5th Cir. 1981). This Court may not substitute its own discretion for that of the District Director. *Johns v. Dept. of Justice, supra*, at p. 891; *Fugiani v. Barber*, 261 F.2d 709, 711 (9th Cir. 1958). The District Director's decision must stand unless it so departs from an established pattern of treatment of others similarly situated without reason, as to be arbitrary and capricious, and an abuse of discretion. See *Nicholas v. INS*, 590 F.2d 802, 808 (9th Cir. 1979).

Plaintiffs present evidence which shows the INS commonly overlooked such technicalities as late applications. They contend his action was thus arbitrary and capricious and that the sole basis for his denial was their Iranian nationality. The INS should look into each case involving a non-immigrant student on its own facts by striking "a fair balance between the character of the act committed and the consequences which will flow from it." See *Mashi v. INS*, 585 F.2d 1309, 1315–17 (5th Cir. 1978). This Court is satisfied that he did.

Non-immigrants are allowed to enter the United States by courtesy only and have no right to remain. One of President Carter's responses immediately after the takeover was to direct the Attorney General to:

"Identify any Iranian students in the United States who are not in compliance with the terms of their entry visas, and take necessary steps to commence deportation proceedings against those who have violated applicable immigration laws and regulations." 15 Wkly.Comp. of Pres.Docs. 2107 (Nov. 10, 1979.)[3]

Discretionary withdrawal of the privilege granted to non-immigrants is "an element of the language of diplomacy by which international courtesies are granted or withdrawn in response to actions by foreign countries." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C.Cir.1979). The INS is free to change its policy when conditions change. *States Marine Int'l., Inc. v. Peterson*, 518 F.2d 1070, 1081 (D.C.Cir.1975), *cert. denied*, 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1975). It need not continue to extend the same courtesy and consideration to nationals of unfriendly powers when acts of war have been perpetrated against the United States. See *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981).

This Court recognizes that Congress, or the President may constitutionally draw distinctions on the basis of nationality unless "wholly irrational". *Narenji v. Civiletti, supra* at p. 747. This does not mean that the District Director may arbitrarily deny the applications of Iranians without authority from the President. But he is entitled to consider the hostile acts of a foreign country in applying his discretion to its nationals in the United States who have violated the terms of their stay. Thus, as a matter of law, the District Director did not abuse his discretion in denying the applications of Shahamiri and Baghayi.

**B.** The Sadigatfars contend that the INS should have approved their application for permanent status when

---

**3.** An INS instruction (Iranian Project IR–42) issued January 4, 1980, reminded INS offices to consider "humanitarian aspects in all Iranian student cases, and treat them like other alien students out of status. Since it was issued after the decision in question, it is not relevant."

made on January 20, 1977, before the hostage crisis. Adjustment in status is governed by § 245[4] of the Immigration and Naturalization Act of 1952 (8 U.S.C. § 1255), amended in 1976.[5]

"The applicant who meets objective prerequisites is merely eligible for adjustment in status and is in no way entitled to such relief." *Faddah v. INS*, 580 F.2d 132, 133 (5th Cir. 1978). When Sadigatfar applied to the INS on January 20, 1977, the visa office of the State Department indicated that non-preference visas were available. But prior to the completion of this application, non-preference visas were not available, and Sadigatfar's application was held in abeyance until a visa number could be allocated to him. The INS procedure was properly administered under its own regulations and operating instructions.[6] An applicant is merely eligible if a visa is immediately available to him at the time of his application and he is otherwise qualified. To require that he be assigned a visa when one was temporarily available to him at the time of his application would be to give a non-preference applicant a preference simply because of an error in the State Department's forecasts of available visas. This would violate the spirit of the statutory scheme Congress enacted.[7]

C. Shamsian was admitted temporarily as a treaty investor under 8 U.S.C. § 1101(a)(15)(E)(ii) and authorized to stay until January 20, 1980. His timely application for extension was denied by the District Director: (1) in accordance with an amendment to 8 C.F.R. § 214.1(c); and (2)

because he failed to establish that the purpose of his visit had not yet been accomplished.

▮▮▮▮ Plaintiff contends there was no rational basis for the District Director's conclusion that Shamsian had accomplished the purpose of his stay in the United States. But again, this Court will not substitute its own discretion for that of the District Director, and will uphold his discretion absent a showing that it was abused. No such showing has been made.

Shamsian's principal contention is that a non-immigrant treaty investor, unlike other non-immigrants, may remain here indefinitely so long as he continues to fulfill his treaty alien status. At one time, treaty merchants were regarded as permanent residents, and prior to 1952, they were admitted as non-immigrants without time limitation,[8] but there is no authority for the proposition that under the Immigration and Naturalization Act of 1952, a non-immigrant treaty investor is to be treated differently than any other non-immigrants. The Attorney General retains discretion to allow treaty investors to remain longer than one year, and this proposition does not appear to be inconsistent with the Treaty with Iran (Treaty of Amity, Economic Relations and Consular Rights, Article II, § 1 (8 U.S.T. 899, T.I.A.S. 3833)). Even if it were inconsistent, Congressional legislation enacted after the treaty would control to the extent it conflicts. Restatement 2d, Foreign Relations Law of the United States, § 145.

---

4. § 245 reads in relevant part as follows: "A. The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion, and under such regulations as he may proscribe to that of an alien lawfully admitted permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time the application is filed."

5. Prior to January 1, 1977, a visa was considered immediately available to an applicant if "immediately available to him at the time his

application is *approved*." The amendment appears to allow the INS to accept the application at an earlier date in some cases to avoid hardship, but, contrary to Sadigatfar's assertion, does not give him the right to become a permanent resident at that time.

6. See 8 C.F.R. § 245.2(a)(2), O.I. 245(a)(6).

7. See generally, 2 C. Gordon and H. Rosenfield, *Immigration Law and Procedure*, § 7.7 (rev. ed. 1981).

8. See 1 C. Gordon and H. Rosenfield, *Immigration and Procedure*, § 2.11(b); *Lowe v. U.S.*, 230 F.2d 664 (9th Cir. 1956).

*Nat'l Ass'n. of Prop. Owners v. United States*, 499 F.Supp. 1223, 1251 (D.C.Minn. 1980). See *Reid v. Covert*, 354 U.S. 1, 18, 77 S.Ct. 1222, 1231, 1 L.Ed.2d 1148 (1957).

Shamsian's application was denied after 8 C.F.R. § 214.1(c) was promulgated. The treaty with Iran does not compel this Court to disregard this federal regulation if it is valid.

All plaintiffs contend that 8 C.F.R. § 214.1(c) as amended April 11, 1980, was promulgated without proper delegation of authority and thus, is constitutionally invalid.[9]

An administrative regulation, in order to be valid must be within the authority conferred upon the regulatory body. Only with such authority does a regulation have the binding effect of law. See *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). But a grant of authority need not be specific. It is only necessary that a reviewing Court satisfy itself that the grant of authority contemplates the regulations issued. *Chrysler Corp. v. Brown, supra*, at p. 308, 99 S.Ct. at p. 1720. In *Narenji v. Civiletti*, 617 F.2d 745 (D.C.Cir.1979), *rehearing denied en banc*, the Court upheld the authority of the Attorney General to promulgate 8 C.F.R. § 214.5. That regulation was the first restriction against Iranians in response to the seizure of our Embassy, and required all Iranian non-immigrant students to report to their local INS office. The Court stated that a Congressional statute "need not specifically authorize each and every action taken by the Attorney General, so long as it is reasonably related to the duties imposed on him." The situation here is analogous.

The Immigration and Naturalization Act of 1952 charges the Attorney General with the administration and enforcement of the Act, and directs him to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority" under its provisions, (8 U.S.C. § 1103(a)), including the time and conditions for admission of non-immigrant aliens (8 U.S.C. § 1184(a)), and deportation of non-immigrants (8 U.S.C. § 1251(a)(9)). The Attorney General discharges his responsibility for enforcing these laws through the INS, headed by its Commissioner.[10]

In response to the hostage crisis, the President injected much of his broad authority over foreign policy into the Attorney General's realm. On November 10, 1979, he directed the Attorney General to identify and deport Iranians here unlawfully.[11] On November 26, 1979, he ordered:

"The Secretary of State and the Attorney General are hereby designated and empowered to exercise in respect of Iranians holding non-immigrant visas, the authority conferred upon the President by § 215(a)(1) of the Act of June 27, 1952 (8 U.S.C. 1185), to proscribe limitations and exceptions from the rules and regulations governing the entry of aliens into the United States." Exec. Order 12172 of Nov. 26, 1979; 44 Fed.Reg. 57947 (Nov. 28, 1979).

But on April 7, 1980, in order to impose "increasing heavy costs" upon Iran to secure prompt release of the hostages, he, *inter alia*: (1) broke diplomatic relations with Iran; (2) announced:

"The Secretary of State and the Attorney General will invalidate all visas issued to Iranian citizens for future entry into the United States, effective today. *We will not reissue visas*, nor will we issue new visas, except for compelling and proven humanitarian reasons, or where the national interest of our own country requires. This directive will be interpreted very strictly." 16 Wkly. Comp.Pres.Docs., 611–12 (Emphasis added)

---

**9.** Although Sadigatfar argues that 8 C.F.R. § 214.1(c) is invalid, he has no standing to challenge it since his application was denied under 8 C.F.R. § 245.1(d).

**10.** See 8 C.F.R. § 2.1 and § 103.1.

**11.** See Statements 15 Wkly.Comp. of Pres. Docs. 2107 (Nov. 10, 1979), and 2131 (Nov. 16, 1979).

and (3) expanded his broad delegation of authority granted November 26, 1979, to include all Iranians, not merely those holding non-immigrant visas. Exec. Ord. 12206 of April 7, 1980; 45 Fed.Reg. 24101. Commissioner Crosland promulgated amendments to 8 C.F.R. § 214, § 245 and § 248, effective April 11, 1980 imposing restrictions and limitations on Iranians who were in the United States at the time.

■ Plaintiffs argue that there was no specific grant of authority for restrictions upon Iranians lawfully in the United States, and that the April 7th statement referring to "reissuance of visas" must be construed to apply only to original entry into the United States. On its face, however, it would appear to refer also to the extension of visas for those already here temporarily. But, if there is any ambiguity, in the sensitive area of foreign policy, such ambiguity should be resolved in favor of the President. *Yassini v. Crosland*, 618 F.2d 1356, 1361, n.6(1980).

It is unrealistic to suggest that the President did not contemplate any of his actions to apply to Iranians already in the United States. This Court is satisfied that Commissioner Crosland was reasonably implementing the President's foreign policy and the regulations were reasonably related to the duties imposed upon him. The regulations are thus valid and binding as law; and required the denial of the Shamsians', Baghayi's and Shahamiri's applications for extension of stay.

### III.

■ The American hostages were freed January 20, 1981, and the amendment to 8 C.F.R. 214.1(c) along with other restrictions against Iranians were rescinded, effective April 24, 1981,[12] but Commissioner Crosland announced that the amendment lifting the restrictions would be applied prospectively only. Thus, these plaintiffs could not claim the benefits of the post-hostage crisis regulations. All plaintiffs contend that the continuing application of a rescinded regulation unconstitutionally discriminates against them.

12. 46 Fed.Reg. 25597–25599 (1981).

There is no "continued" application of the regulation as it existed during the hostage crisis. Plaintiffs' applications were properly denied under the old regulations which this Court has found valid. That decision is final unless the District Director, in his discretion, reconsiders the cases in light of the new regulations.

■ Assuming plaintiffs are questioning the authority of Commissioner Crosland to amend the regulations prospectively only, *Narenji v. Civiletti, supra,* disposes of this issue. Since Commissioner Crosland was acting within his authority in promulgating the regulations, he was acting within his authority in rescinding them upon order from the new administration. The decision to impose restrictions upon Iranians during the hostage crisis was within the ambit of a President's power over foreign policy, as are the decisions to lift those restrictions. But the end of a crisis does not mean that the Commissioner of the INS would have the power to erase a prior political decision of the President without specific authorization. If the Commissioner had reviewed all INS decisions made during President Carter's hostage crisis foreign policy, he surely would have been acting outside the scope of his authority.

### CONCLUSION

The Court has considered all contentions of the parties and concludes that the actions of the INS, and the regulations upon which they were based were proper under the circumstances and under the Constitution of the United States. There is no material issue of fact, and defendant is entitled to judgment as a matter of law. It is thus hereby ordered that: (1) defendant's motions to dismiss, treated as motions for summary judgment, are granted in each case; and (2) the Sadigatfars' and Shamsians' motions for summary judgment are denied. The complaints and these civil actions are dismissed in their entirety.

Defendant will prepare forthwith appropriate forms of judgment.