Ashok Peter MENEZES,
Petitioner-Appellant,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent-
Appellee.

No. 78–2074.

United States Court of Appeals,
Ninth Circuit.

May 29, 1979.

Robert O. Wells, Jr. (argued), Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for petitioner-appellant.

Lawrence W. Chamblee, Crim. Div., Washington, D. C., for respondent-appellee.

Before WRIGHT and GOODWIN, Circuit Judges, and WILLIAMS, District Judge.*

* Hon. Spencer M. Williams, Northern District of California.

EUGENE A. WRIGHT, Circuit Judge:

Menezes petitions for review of a deportation order for failure to comply with the conditions of the nonimmigrant status under which he was admitted. We affirm.

## FACTS

On August 15, 1972, Menezes entered the United States from India as a nonimmigrant temporary visitor for pleasure. He was later permitted to remain until February 28, 1973, by adjusting his status to that of nonimmigrant student.

On March 7, 1973, the Immigration and Naturalization Service (INS) initiated deportation proceedings because Menezes' permission to remain had expired. At a deportation hearing on March 29, he admitted that he was no longer a full time student as required by his nonimmigrant status, but denied deportability because, on March 24, 1973, he had married a United States citizen. Because of the marriage, the immigration judge continued the case to allow Menezes' wife to petition the INS for issuance of an immigration visa for her husband.

In April 1973, Menezes' wife filed an immediate relative visa petition on his behalf, which was finally approved in April, 1975.[1] In the meantime, an order of deportation had issued against him but, in May 1975, the Board of Immigration Appeals (BIA) granted a motion to reopen the deportation proceedings.

The final deportation hearing took place in October, 1975. The immigration judge on June 11, 1976, found that Menezes met the statutory requirements for adjustment of status from nonimmigrant to permanent resident, but denied adjustment of status because of the deterioration of the marriage, purporting to exercise discretion which he believed he had under the Immigration and Nationality Act (the Act) § 245, 8 U.S.C. § 1255 (1976). The judge noted that Menezes' marriage had "not been a

1. Mrs. Menezes' visa petition on her husband's behalf was originally denied and the denial was affirmed by the BIA. It was apparently reconsidered and approved in April, 1975.

smooth one to say the least." There were at least six separations and, at the time of the final deportation hearing, the couple had been separated since mid-July, 1975.[2]

On June 22, 1976, Menezes appealed the order and, on June 25, he and his wife were divorced. Consequently, the Board of Immigration Appeals dismissed the appeal and affirmed the order of deportation on the grounds that under 8 C.F.R. § 205.1(a)(4) (1978), approval of his visa petition had been revoked by the divorce,[3] making him ineligible for adjustment of status.

## AGENCY DISCRETION

On appeal, Menezes first contends that the immigration judge had no discretion to deny his application for adjustment of status. He argues that, once his wife's petition for an immediate relative visa on his behalf had been approved and the immigration judge found that he was not ineligible for adjustment of status on other grounds, approval of his application was mandatory under § 201(b) of the Act, 8 U.S.C. § 1151(b) (1976). That section provides:

> The "immediate relatives" . . . shall mean the children, spouses, and parents of a citizen of the United States: . . . The immediate relatives specified in this subsection who are otherwise qualified for admission as immigrants shall be admitted as such, without regard

to the numerical limitations in this chapter.

Menezes applied for adjustment under § 245 of the Act. The section expressly confers discretion to adjust status upon the Attorney General who delegates that discretion to the INS. *See Fulgencio v. INS,* 573 F.2d 596, 597 (9th Cir. 1978). Menezes contends that, although he applied for adjustment under § 245, that section does not govern adjustments of status for immediate relatives of citizens because § 201(b) not only authorizes, but mandates adjustment for such aliens.

To support this argument, he quotes § 245:

> Upon the approval of an application for adjustment made under . . . this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for the adjustment of status is made, and the *Secretary of State shall reduce by one the number of the preference or non-preference visas authorized to be issued under sections 1152(e) or 1153(a) of this title within the class to which the alien is chargeable . . . .*

8 U.S.C. § 1255 (1976) (emphasis added). This language, he argues, means that § 245 applies only to aliens grouped within the preference or non-preference visa catego-

2. When final separation occurred, Menezes refused to allow his wife to return to his home until she discontinued habits of which he disapproved. Nevertheless, he testified that he thought the marriage was still viable and that he did not think his wife was going to divorce him.

3. The regulation provides in part:

> The approval of a petition . . . is revoked as of the date of approval . . . if any of the following circumstances occur before the beneficiary's journey to the United States commences or, if the beneficiary is an applicant for adjustment of status to that of permanent resident, before the decision on his application becomes final:
>
> (a) *Relative petitions.*
>
> . . . . .
>
> (4) *Upon the legal termination of the relationship of husband and wife* when a petition has accorded status as the spouse of a citizen

> . . . under section 201(b) . . . of the Act.

8 C.F.R. § 205.1 (1978) (emphasis added).

It must be read in conjunction with § 205 of the Act; 8 U.S.C. § 1155 (1976), which states that the Attorney General may revoke approval of a petition for immediate relative status, "at any time, for what he deems to be good and sufficient cause."

An alien does not obtain a vested right upon approval of a visa petition. *Wright v. INS,* 379 F.2d 275, 276 (6th Cir. 1967), *citing Amarante v. Rosenberg,* 326 F.2d 58 (9th Cir. 1964). Thus, "[a] citizen who files a visa petition has a right to withdraw it and upon notice of withdrawal to the Service, revocation of approval is automatic." *Wright,* 379 F.2d at 276.

The effect of the regulation is to create a presumption that the citizen spouse intended to withdraw the petition. Menezes does not question the validity of this presumption.

ries mentioned. Because immediate relatives are admitted without regard to numerical limitations, Menezes contends that § 245 discretion to adjust status does not apply to them.

He also cites *Matter of Dixon,* Interim Decision No. 2615 (BIA 1977), in which the Board of Immigration Appeals discussed applications for permanent residence status made by fiances of United States citizens. The Board stated:

> While the regulation, . . ., requires the filing of an application for permanent resident status pursuant to § 214(d) to be made on form I–485, and is included in the regulations generally relating to adjustment of status, it is in fact adjustment under a separate and distinct provision of the statute, carrying its own requirements, and having no relationship to the requirements of § 245.

Interim Decision No. 2615 at 4. *See also Whetstone v. INS,* 561 F.2d 1303, 1307, 1309 (9th Cir. 1977). Menezes contends that § 201(b) is similarly "separate and distinct."

We disagree with his interpretation of §§ 201 and 245. The quoted language in § 245 does not limit the application of that section to aliens who fall within the numerical limitations of the Act. It merely provides that *if* aliens applying for adjustment of status fall within the categories mentioned, and their applications are approved, then the number of visas available in that category shall be reduced accordingly.

It is clear from the original version of § 245 and from the legislative history of that section that Congress intended it to apply to immediate relatives. As originally enacted in 1952, § 245 specifically referred to aliens "claiming a nonquota status under section 101(a)(27)(A)" which at that time included immediate relatives of citizens.

Act of June 27, 1952, Pub.L. No. 82–414, 66 Stat. 217. Such aliens were required to have completed a year of residence before acquiring their nonquota status in order to qualify for § 245 adjustment of status.

In 1956, Congress amended § 245 to remove the one-year residence requirement for aliens claiming nonquota status. Act of Aug. 21, 1958, Pub.L. No. 85–700, 72 Stat. 699. The amendment deleted references to quota or nonquota immigrants, referring only to "immigrants." The term clearly was meant to encompass both categories of immigrants.

The purpose of the legislation was not to remove nonquota immigrants from the purview of the statute, but to eliminate the residence requirement and to end the practice of requiring eligible aliens to depart the country in order to be admitted for permanent residence. S.Rep. No. 2133, 85th Cong., 2d Sess. *reprinted in* [1958] U.S.Code Cong. & Admin.News, p. 3698. The report mentions "spouses of United States citizens" as among the primary beneficiaries of the legislation. [1958] U.S.Code Cong. & Admin.News at 3699.

Finally, § 245(c), added in 1976, contains a reference to spouses of citizens which indicates that Congress intended § 245 to apply to them.[4]

Menezes also misreads § 201(b). Unlike § 214(d), which clearly does mandate admission for permanent residence of fiances[5] who marry within 90 days of entry and otherwise meet the admission requirements, § 201(b), does not contain mandatory language. *Matter of Dixon* is therefore inapposite.

Section 201 is entitled "Numerical limitations on lawful admissions." The statement that "immediate relatives . .

**4.** Section 245(c) reads in pertinent part:

> The provisions of this section shall not be applicable to (1) an alien crewman; (2) an alien (other than an immediate relative as defined in section 1151(b) [201(b)] of this title) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status; . . ..

8 U.S.C. § 1255(c) (1976).

**5.** Section 214(d) carefully refers to both fiances and fiancees of citizens. Because appellant is a male, we will use the masculine throughout to avoid confusion when comparing alien fiances with alien spouses.

otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations," 8 U.S.C. § 1151(b) (1976), does not authorize automatic admission of immediate relatives, but merely exempts them from the numerical limitations. It does not evidence congressional intent either to limit the agency's discretion or to bypass the requirements of § 245.

The immigration judge, acting for the agency, had discretion to deny Menezes' application for adjustment of status. Menezes argues, however, that even if this is so, the agency abused its discretion and violated equal protection principles by treating him differently than it treats similarly situated fiances of citizens who marry within the 90-day time limit.

## EQUAL PROTECTION

To analyze Menezes' equal protection argument, we must spell out the processes by which fiances of citizens and spouses of citizens obtain visas and secure permanent resident status. The procedures for the two groups differ, in part because fiances are generally not in this country when they apply for visas. Spouses often are.

*The Statutory Scheme.*

Issuance of visas to fiances of citizens is governed by the Act § 214(d); 8 U.S.C. § 1184(d) (1976). An alien fiance must first apply for a visa to the United States consular officer in his country. The officer will not grant the application until he or she receives a petition filed by the sponsoring United States citizen and approved by the Attorney General. The latter will approve the petition:

> only after satisfactory evidence is submitted by the petitioner to establish that the parties have a bona fide intention to marry and are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival.

Once the Attorney General has approved the petition, the consular officer will issue a nonimmigrant visa which allows the alien to enter the United States for the sole purpose of marrying the petitioner. The Act § 101; 8 U.S.C. § 1101(a)(15)(K) (1976).

If the marriage does not occur within the 90 days, the alien fiance must leave or be deported. If it does occur within the time limit, and the alien is "otherwise admissible," then "the Attorney General shall record the lawful admission for permanent residence of the alien . . . as of the date of the payment of the required visa fees." The Act § 214(d); 8 U.S.C. § 1184(d) (1976).

Alien spouses of citizens who are present in the United States must also begin the admission process with a petition to the Attorney General. The citizen spouse must submit a petition on behalf of the alien spouse, supported by the necessary documentation, requesting recognition of the alien spouse's immediate relative status. The Act § 204(a); 8 U.S.C. § 1154(a) (1976).

The Attorney General may investigate to determine whether the facts as stated are true and, if so, may approve the petition, which is then forwarded to the Secretary of State, who authorizes the appropriate consular officer to grant the requested status.

While his petition for immediate relative status is pending, or even in anticipation of filing the petition, the alien spouse may petition for adjustment of status to that of permanent resident pursuant to § 245. The Attorney General will make the adjustment, "in his discretion" if:

> (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

The Act § 245(a); 8 U.S.C. § 1255(a) (1976).

It is apparent that both spouses and fiances submit to an investigative process to ascertain either that there is a bona fide marriage or whether there is a bona fide intent to marry within 90 days of entry.

*Menezes' Argument.*

The linchpin of Menezes' argument is *Whetstone v. INS,* 561 F.2d 1303 (9th Cir.

1977). The appellant in *Whetstone* entered the country as a nonimmigrant fiancee, married a United States citizen within 90 days of entry, but left him less than 30 days after the marriage took place. The Attorney General did not record her admission for permanent residence; therefore, she applied for adjustment of status under § 245. Adjustment was denied because the INS district director believed that no " 'bona fide and lasting marital relationship' " existed at the time of the application for adjustment. *Id.* at 1305.

This court held that, if the marriage had been entered into in good faith, the INS could not consider its continuing viability in passing upon an application for permanent resident status submitted under the fiance statute, § 214(d), except insofar as it was relevant to the parties' intent at the time of the marriage.[6] We concluded that nothing in that provision authorized the INS to impose a continuing viability requirement on such applicants.

The INS subscribes to this interpretation of § 214(d) (*Matter of Dixon,* Interim Decision # 2615, 4 (BIA 1977); *Matter of Blair,* Interim Decision # 2152 (BIA 1972)), but continues to impose a continuing viability requirement upon spouses of citizens applying for an adjustment of status under § 245 based upon their status as immediate relatives (*see Matter of Dixon,* Interim Decision # 2615 at 4; *Matter of Sosa,* Interim Decision # 2469 (BIA 1976)).

It reasons that "the specific discretionary power contained in section 245 permits the standard of a viable marriage to be applied in cases under that section." *Matter of Harris,* Interim Decision # 2336, 9 (BIA 1974) (dissenting opinion, approved in *Whetstone v. INS,* 561 F.2d 1303, 1309 (9th Cir. 1977)).

Here, as in *Whetstone,* there is no challenge to the legality of Menezes' marriage. Nor does the INS assert that the marriage was a sham, entered into to evade the immigration laws. The immigration judge denied the application for adjustment of status because of the couple's numerous separations during the marriage and their separation at the time of the ruling.[7]

Menezes argues that his situation as a spouse of a citizen cannot rationally be distinguished from that of a fiance; therefore *Whetstone* should apply to his case.[8] *Whetstone,* he contends, required the immigration judge and the Board to consider only the validity of his marriage at the time it was entered into, not its stability at the time he applied for adjustment. Their failure to do so, he asserts, constituted both an abuse of discretion and a violation of equal protection.

---

6. The court relied upon *Bark v. INS,* 511 F.2d 1200 (9th Cir. 1975), in which the INS denied adjustment of status to an alien spouse whose marriage, they asserted, was a sham. The *Bark* court, discussing the proof needed to demonstrate that a marriage was sham, stated:

 Conduct of the parties after marriage is relevant only to the extent that it bears upon their subjective state of mind at the time they were married. *Lutwak v. United States* (1953) (344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593). . . . [E]vidence of separation, standing alone, cannot support a finding that a marriage was not bona fide when it was entered.

 511 F.2d at 1202.

 Here, the INS does not contend that Menezes' marriage was a sham.

7. In determining whether the agency violated Menezes' equal protection rights, we must look to the order of the Board of Immigration Appeals, not that of the immigration judge. We may affirm the order only "on the same basis articulated in the order . . . itself." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); *see SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

 Menezes makes no distinction between the two decisions, arguing only that the agency, in considering the deterioration of his marriage, failed to treat him like a fiance. Because both the separations and the divorce reflect deterioration of the marriage, both decisions were erroneous under Menezes' theory.

8. *Whetstone* is distinguishable from this case in that there, the petitioner, although separated, remained married to her citizen spouse. Menezes was divorced shortly after his appeal. The difference is irrelevant, however, because the INS stated in *Matter of Dixon,* Interim Decision # 2615 (BIA 1977): "a nonviable *or terminated* marriage does not bar an applicant from section 214(d) benefits, . . . ." *Id.* at 4 (emphasis added.)

*Analysis.*

■ Aliens are entitled to the protection of the Fifth and Fourteenth Amendments. *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), *citing Wong Yang Sung v. McGrath,* 339 U.S. 33, 48–51, 70 S.Ct. 445, 94 L.Ed. 616 (1950); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

■ Although the federal government and its agencies are not bound by the Fourteenth Amendment equal protection clause, the Fifth Amendment due process clause has an equal protection component which imposes similar, but not identical, limitations on government actions. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). "[D]iscrimination *within* the class of aliens—allowing benefits to some aliens but not to others"—may be permissible if it is rationally related to achieving a valid governmental objective. *Mathews,* 426 U.S. at 80, 81–83, 96 S.Ct. at 1892 (emphasis in original).[9]

■ Even if automatic admission for permanent residence of fiances who marry within 90 days of entry, together with application of the *Whetstone* rationale to fiances, constitutes a benefit to them that is denied to spouses of citizens, these practices do not violate equal protection unless they do not rationally help to further legitimate governmental goals.

We find that the disparate treatment of fiances and spouses stems from the different ends which Congress sought to further with respect to each group. Because the means which Congress and the INS have adopted are rationally related to achieving those ends, and the ends are legitimate, neither the statutory scheme nor its administration by the INS, denies Menezes the equal protection of the laws.

The purpose behind § 214(d) is to facilitate formation of marital relationships. Investigation of the parties necessarily takes place prior to the marriage. The relevant inquiry, enunciated in the statute, is whether the parties have a bona fide intent to marry after the alien enters.

The object of the screening is issuance of a temporary visa, conferring only nonimmigrant status. To be eligible for the permanent visa, the fiance must be examined again upon entry, and must actually marry the sponsoring citizen within 90 days. Marriage within the time limit essentially confirms that the intent to marry after entry was bona fide.

By requiring that fiances be admitted for permanent residence once they marry, Congress affirmed that the purpose of the legislation is to facilitate formation of a new marital unit. It follows from the mandatory aspect of § 214(d) that, as we held in *Whetstone,* subsequent deterioration of the marriage is irrelevant in administering this provision, unless it indicates that, at the time of the marriage, the parties did not actually intend to form a bona fide marital relationship.

In the case of spouses, Congress sought to facilitate the preservation of existing marital relationships, not the formation of new

**9.** *Mathews* involved the constitutionality of federal statutes governing Medicare benefits. The Supreme Court has never upheld an equal protection challenge to provisions of the Immigration and Nationality Act.

In *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), appellants asserted that § 101(b)(1) of the Act, which recognizes a parent-child relationship between an illegitimate child and its mother, but not its father, unfairly discriminates on the basis of sex and illegitimacy. The Court found no equal protection violation because the distinction was based on Congress' valid concern about problems of proof of parentage which inhere in the father-child relationship.

The Second Circuit faced an equal protection challenge to the Immigration and Nationality Act in *Francis v. INS,* 532 F.2d 268 (2d Cir. 1976). The court concluded that § 212(c) of the Act was unconstitutional as applied because it denied equal protection to certain aliens. One commentator points out, however, that "[*Francis*] is the only decision in which a court has ruled a section of the Immigration and Nationality Act unconstitutional on equal protection grounds." Recent Developments in Immigration Laws 1976, 14 *San Diego L.Rev.* 301, 317 (1976) (footnote omitted).

ones.[10]  Investigation necessarily takes place after the marriage has occurred and the factual inquiry differs accordingly. Because the legislative purpose is preservation, the INS inquires into the existence of a bona fide marital relationship. The applicant seeks a permanent, not a temporary, visa.

Here, mandatory admission for permanent residence based primarily on intent at the time of the marriage does not further the congressional goal of preservation. Consequently, Congress provided that, to be admitted for permanent residence, immediate relatives must submit to the discretion of the Attorney General by applying for adjustment of status under § 245. In determining whether to grant permanent resident status based on a marriage, it is highly relevant that the relationship may no longer be in existence when the application is under consideration. Thus *Whetstone*, which directs the INS to ignore deterioration of a marriage except as it bears upon intent at the time of the marriage, is simply inapplicable.

We affirm dismissal of Menezes' appeal.

**10.**  In § 201(b);  8 U.S.C. § 1151(b) (1976), Congress manifested the general intent to preserve existing family units, from which we can infer the specific intent to preserve existing marital relationships.