660 F.2d 880
 Ali Akabar DASTMALCHI, Petitioner in No. 80-2432
and
Mohsen Tarassoly, Petitioner in No. 80-2440
and
Hossein Saliminia, Petitioner in No. 80-2441,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 Nos. 80-2432, 80-2440 and 80-2441.
 United States Court of Appeals,
Third Circuit.
 Argued July 23, 1981.
Decided Sept. 17, 1981.
Rehearing Denied Nov. 13, 1981.
 
 Robert P. Deasy (argued), Healy & Deasy, Pittsburgh, Pa., for petitioners.
 James P. Morris, General Litigation and Legal Advice Section, Criminal Division, James A. Hunolt (argued), Dept. of Justice, Washington, D. C., for respondent.
 Before ADAMS, HUNTER and SLOVITER, JJ.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Petitioners in this appeal, nonimmigrant Iranian students found deportable by the Immigration and Naturalization Service (INS), attack on constitutional grounds the regulation which led to discovery of their illegal immigration status. In addition, petitioners contend that the INS abused its discretion both in implementing that regulation and in refusing to restore them to nonimmigrant student status. Because we conclude that this Court lacks jurisdiction under section 106(a) of the Immigration and Nationality Act to entertain such challenges, we are unable to address petitioners' claims and thus dismiss their petitions for review.
 
 I.
 
 2
 As one of a number of responses to the takeover by Iranian militants of the United States Embassy in Tehran, President Carter directed the Attorney General to "identify any Iranian students in the United States who are not in compliance with the terms of their entry visas, and to take the necessary steps to commence deportation proceedings against those who have violated applicable immigration laws and regulations." 15 Weekly Compilation of Pres.Doc. 2107 (Nov. 10, 1979). On November 14, 1979, the Attorney General, acting pursuant to the Immigration and Nationality Act,[1] promulgated Regulation 214.5, requiring all nonimmigrant alien post-secondary students from Iran to report to a local Immigration and Naturalization Service representative and to provide that representative with "information as to residence and maintenance of nonimmigrant status."[2] The regulation, which became effective immediately, provided that a nonimmigrant student's failure to comply with the reporting requirement would subject him or her to deportation proceedings under section 241(a)(9) of the Act.[3]
 
 
 3
 Each of the three petitioners in this appeal reported to the Pittsburgh office of the INS and provided the information required under Regulation 214.5. With respect to each petitioner, the INS ultimately issued an order to show cause, charging that student with specified violations of the Act. Petitioner Ali Akbar Dastmalchi was alleged to have remained in the United States beyond the period authorized by his stay;[4] petitioner Hossein Saliminia was charged with violating conditions of his status by transferring from one educational institution to another without receiving prior approval from the INS;[5] petitioner Mohsen Tarassoly was alleged to have abridged both the stay and the transfer provisions.[6]
 
 
 4
 Separate deportation hearings were conducted for each petitioner by an Immigration Judge in the Pittsburgh INS office. Dastmalchi admitted the factual allegations in the order applicable to him, but refused to concede deportability and challenged the constitutionality of the reporting regulation. The Immigration Judge found Dastmalchi deportable as charged and granted him the privilege of voluntary departure in lieu of deportation. Saliminia, too, was found at a hearing to be deportable as charged and was given the opportunity to depart voluntarily. The Immigration Judge rejected Saliminia's efforts to terminate deportation proceedings on the ground that the INS impermissibly had singled out for review only students of Iranian nationality. A similar motion was denied at Tarassoly's hearing. Tarassoly was adjudged deportable for having remained in the United States longer than permitted by his visa and was granted an opportunity for voluntary departure. In light of the determination that he was deportable because of an overstay, the Immigration Judge did not decide whether Tarassoly also had violated the school transfer restrictions.
 
 
 5
 The Board of Immigration Appeals dismissed the appeal of each petitioner. In so doing, the Board rejected various challenges to the constitutionality of Regulation 214.5, and refused to review the discretionary refusals by the INS to reinstate petitioners to nonimmigrant student status despite their stay and transfer violations. Each petitioner subsequently filed with this Court a petition for review of his deportation order. Jurisdiction was alleged to lie under section 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a).
 
 II.
 
 6
 Petitioners advance three related challenges to the validity of their deportation orders. Even though we decline to consider the merits of these contentions, they must be set forth in some detail in order to understand why we dismiss for lack of jurisdiction.
 
 
 7
 First, petitioners contend that Regulation 214.5 on its face and in its implementation constitutes a denial of equal protection in violation of the due process clause of the Fifth Amendment. Petitioners assert that the regulation and accompanying orders draw an arbitrary and impermissible distinction between Iranian and non-Iranian nonimmigrant alien students, in that only the former were subjected to an intensive status review by the INS. Such discrimination on the basis of national origin is improper, petitioners claim, in light of the absence of a compelling connection between their own activities and the Tehran hostage incident.
 
 
 8
 Second, petitioners argue that Regulation 214.5 and subsequent INS implementing orders in effect served to deny to Iranian students discretionary relief "customarily afforded to students who have violated a condition of admission."[7] The INS, petitioners charge, acting in accordance with formal or informal internal instructions, mechanically and inflexibly applied the regulation to result in a deportation order even for a "minor" or "technical" infraction by an Iranian student. Petitioners assert that the arbitrary and discriminatory refusal on the part of the INS to exercise discretion constituted an abuse of discretion, in violation of the Administrative Procedure Act. By denying all discretionary relief to Iranian nonimmigrant students, they assert, the INS prejudged deportation proceedings on the basis of nationality instead of considering the merits of each case.[8] Petitioners base their contention in large part on the existence of an instruction issued by the INS on January 4, 1980, which reminded agency officials that Iranian students were to be treated "in the same manner as students of all other nationalities."[9] They conclude that, had there not been previous discriminatory treatment of Iranians by the INS, such a "curative" memorandum would not have been necessary.
 
 
 9
 Third, each petitioner challenges the refusal by the INS to grant him discretionary relief and reinstate him to nonimmigrant student status. Prior to the Iranian episode, "it was the common and regular practice of the Service to restore to status students who had committed technical violations of a de minimus nature."[10] Thus, each petitioner alleges, INS actions with respect to determination of his status were both inconsistent with past agency practices and in violation of operating instructions such as that issued on January 4, 1980.
 
 
 10
 The Immigration and Naturalization Service, in its brief filed with this Court, rebutted each of petitioners' substantive attacks on Regulation 214.5 and INS actions. At the outset, however, the INS challenged the jurisdiction of this Court to entertain these petitions for review under section 106(a). It is to the jurisdictional question that we now turn.
 
 III.
 A.
 
 11
 In 1961, Congress amended the Immigration and Nationality Act by adding section 106(a), 8 U.S.C. § 1105a(a), which vests in the courts of appeals initial and exclusive jurisdiction to review "all final orders of deportation" entered "pursuant to administrative proceedings under section (242(b), 8 U.S.C. s) 1252(b)."[11] In enacting section 106(a), Congress sought to remedy the "flagrant abuse of judicial review" by "aliens, mostly subversives, gangsters, immoral, or narcotic peddlers," who "skillfully exploit the judicial process" by "repetitive appeals to the busy and overworked courts with frivolous claims of impropriety in the deportation proceedings." H.R.Rep.No.1086, 87th Cong., 1st Sess. 22-23, reprinted in (1961) U.S.Code Cong. & Ad.News 2950, 2967.
 
 
 12
 Despite the seemingly straightforward language of the statute "all final orders of deportation" considerable controversy developed as to the precise contours of appellate jurisdiction under section 106(a). For example, writing shortly after the provision took effect, Judge Friendly predicted that "dozens of decisions will be needed before the workings of the statute become clear." Friendly, The Gap in Lawmaking Judges Who Can't and Legislators Who Won't, 63 Columbia L.Rev. 787, 796 (1963). In essence, problems arose because section 106(a) was subject to two conflicting interpretations. Some courts held that only questions involving the bare validity of a deportation order could be determined directly by a court of appeals. Other courts adopted a much broader position, concluding that the statute's ambit extended to some or all of a host of discretionary and underlying decisions which, if in error, would serve to void the deportation order regardless of the validity of the order standing alone.[12]
 
 
 13
 To date, the Supreme Court has entered the section 106(a) controversy on three occasions. At first, it appeared that the Court might take a position in accord with those who broadly interpreted the scope of appellate jurisdiction under that statute. In Foti v. Immigration and Naturalization Serv., 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), Chief Justice Warren, writing for the Court, concluded that section 106(a) review extended not merely to the bare finding of deportability, but also to "all determinations made during and incident to the administrative proceeding conducted by a special inquiry officer, and reviewable together by the Board of Immigration Appeals." Id., at 229, 84 S.Ct. at 312. Consequently, a request for a suspension of deportation made in the course of a section 242(b) deportation proceeding fell within the exclusive jurisdiction of the courts of appeals. The following Term, in a per curiam opinion, the Court reversed a lower court's holding that the denial of a request before the Board of Immigration Appeals to reopen section 242(b) deportation proceedings was not appealable under section 106(a). Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964).
 
 
 14
 In Cheng Fan Kwok v. Immigration and Naturalization Serv., 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), however, the Supreme Court served notice that an expansive reading of section 106(a) was unacceptable. In Cheng Fan Kwok, a Chinese seaman, found deportable after a section 242(b) proceeding, obtained discretionary permission to depart voluntarily and then failed to do so. In response to a subsequent order to surrender for deportation, Cheng requested a stay of deportation. When his request was rejected, Cheng petitioned this Court for review of the denial of a stay.
 
 
 15
 The Supreme Court affirmed our holding, 381 F.2d 542 (3d Cir. 1967), that we lacked jurisdiction to entertain the petition. After reviewing the language and legislative history of the provision, the Court concluded that "Congress quite deliberately restricted the application of § 106(a) to orders entered during proceedings conducted under § 242(b), or directly challenging deportation orders themselves." Cheng Fan Kwok, supra, at 215, 88 S.Ct. at 1975. Therefore, the Court held, "the judicial review provisions of § 106(a) embrace only those determinations made during a proceeding conducted under § 242(b), including those determinations made incident to a motion to reopen such proceedings." Id. at 216, 88 S.Ct. at 1976 (emphasis added). Since the denial of a stay under review was neither a "final order of deportation" nor entered in the course of a section 242(b) deportation proceeding, the Court declared that section 106(a) was inapplicable. Id., at 212, 88 S.Ct. at 1974. The alien instead should have sought relief in an appropriate district court. Id., at 210, 88 S.Ct. at 1973.
 
 B.
 
 16
 According to the Foti-Giova-Cheng Fan Kwok trilogy, courts of appeals have initial jurisdiction under section 106(a) only in cases seeking judicial review of: (1) a final order of deportation entered pursuant to section 242(b) deportation proceedings; (2) an order made during a section 242(b) deportation proceeding and reviewable by the Board of Immigration Appeals (Foti); or (3) a motion to reopen deportation proceedings previously conducted under section 242(b) or to reconsider a final order of deportation (Giova). Courts of appeals have no jurisdiction under section 106(a) to review a deportation-related issue that does not fall within one of these three categories, even though resolution of that issue in the alien's favor might "directly affec(t) the execution of" his final order of deportation. Cheng Fan Kwok, supra, at 213, 88 S.Ct. at 1974.[13] We conclude, therefore, that this Court lacks jurisdiction to consider the claims advanced by petitioners in this appeal. Petitioners here do not challenge directly a final order of deportation, an order entered in the course of their deportation hearings, or the denial of a motion to reopen deportation proceedings. Rather, they attack: (1) the constitutionality of Regulation 214.5; (2) the alleged refusal by the INS to exercise discretion with respect to any of the Iranian student cases; and (3) the denial of discretionary relief to petitioners themselves. As we read Cheng Fan Kwok, none of these arguments, however compelling on its face, is encompassed within the scope of section 106(a).
 
 
 17
 Petitioners' first contention goes to the constitutionality of the regulation underlying these deportation orders. In considering this contention, it is crucial to realize that the constitutionality of underlying statutes and regulations cannot be placed in issue at section 242(b) proceedings. 1 C. Gordon & H. Rosenfield, supra, at § 1.10e. Neither an Immigration Judge nor the Board of Immigration Appeals, in the course of a deportation proceeding, can enter an order voiding an alien's deportation in response to a constitutional objection.[14] Therefore, since under Cheng Fan Kwok the scope of section 106(a) jurisdiction mirrors that of the section 242(b) proceeding, it seems logical to treat constitutional challenges as not immediately appealable to courts of appeals.
 
 
 18
 Despite the force of this syllogism, a number of federal courts have concluded that a court of appeals, petitioned under section 106(a), may consider "constitutional infirmities ... which, if well taken, would void the deportation order," Riva v. Attorney General of United States, 377 F.Supp. 1286, 1288 (D.D.C.1974). In fact, two courts of appeals the Ninth and Tenth Circuits explicitly have endorsed this view in decisions that postdated Cheng Fan Kwok.[15] For example, in Chadha v. Immigration and Naturalization Serv., 634 F.2d 408 (9th Cir. 1980), the Court of Appeals for the Ninth Circuit, in rejecting an argument that it lacked jurisdiction to entertain constitutional questions under section 106(a), concluded that:
 
 
 19
 (i)t would be anomalous ... for Congress to provide a single form of review for deportability determinations, yet preclude from that same appeal any questions of the INA's constitutionality. We reject (such a) construction of section 106 and find that review of final deportation orders includes review of matters upon which the final order is contingent.
 
 
 20
 Id., at 414. Were we to follow Chadha and its predecessors, petitioners on this appeal would be entitled to a disposition, on the merits, of their attacks on the constitutionality of Regulation 214.5 and accompanying INS implementing orders. For the reasons set forth below, however, we decline so to proceed.
 
 
 21
 First, the decisions upholding the initial jurisdiction of a court of appeals to resolve constitutional disputes rely either upon each other or upon pre-Cheng Fan Kwok precedents.[16] With one exception, Chadha, they make no attempt to reconcile their basic premise that "(n)othing in (section 106(a)) is explicit in directing that only issues raised at the (section 242(b)) hearing may be raised on a petition for review," Pilapil, supra, at 9 with the holding of Cheng Fan Kwok.[17] They do not explain why an alien who challenges the Act's constitutionality should be able to obtain immediate review in a court of appeals, however implausible that claim, while, under Cheng Fan Kwok, an alien who contests a non-constitutional determination underlying but entered collateral to his or her deportation proceeding is relegated initially to a district court, however tenable that contention. In essence, the Ninth and Tenth Circuit opinions other than Chadha simply assert that section 106(a) encompasses constitutional challenges an assertion that cannot be squared with the Supreme Court's instruction that, "(a)s a jurisdictional statute, (section 106(a)) must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes," Cheng Fan Kwok, supra, 392 U.S. at 212, 88 S.Ct. at 1974.
 
 
 22
 Second, a careful examination of the reasoning offered by the Ninth Circuit in Chadha, the only decision from this line of cases that attempts to demonstrate its compatibility with Cheng Fan Kwok, serves to reinforce our view that Cheng Fan Kwok forecloses initial review at the appellate level of the constitutionality of the Immigration and Nationality Act. In Chadha, an alien who conceded his deportable status at a section 242(b) hearing requested from the INS and was granted a suspension of deportation. Subsequently, however, the House of Representatives, pursuant to section 244(c)(2) of the Act, 8 U.S.C. § 1254(c)(2), disapproved that suspension and the INS again ordered Chadha deportable. At his reconvened deportation proceedings, Chadha challenged the constitutionality of the congressional disapproval; the Board of Immigration Appeals, adhering to its policy of not entertaining constitutional claims, dismissed that argument as beyond its scope of review. Chadha then petitioned the Court of Appeals for the Ninth Circuit under section 106(a) and repeated his constitutional contention. The court concluded that it did have jurisdiction to consider the constitutionality of a one-house "legislative veto" such as that employed to overrule the INS in Chadha's case.[18]
 
 
 23
 Chadha begins by rejecting the suggestion that the phrase "final orders of deportation ... made ... pursuant to administrative proceedings under section 1252(b)" contained in section 106(a)
 
 
 24
 limit(s) appellate review to only the actual decisions and conclusions made by the special inquiry officer during a section 242(b) hearing.... We conclude the phrase 'final orders' includes all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing.
 
 
 25
 Id., at 412 (emphasis added). We believe that the Chadha court's interpretation of section 106(a) is fundamentally at odds with Cheng Fan Kwok. In Cheng Fan Kwok, the Supreme Court explicitly refused to approve the notion that " § 106(a) should be understood to embrace all determinations 'directly affecting the execution of the basic deportation order,' whether those determinations have been reached prior to, during, or subsequent to the deportation proceeding." Cheng Fan Kwok, supra, 392 U.S. at 210, 212, 88 S.Ct. at 1973, 1974. As discussed previously, the Supreme Court, in defining the scope of section 106(a), placed exclusive emphasis on whether a determination was made in the course of a section 242(b) deportation hearing; the Chadha formulation, however, admittedly incorporates determinations not "actually made at the hearing." A faithful application of Cheng Fan Kwok compels the conclusion that, because the constitutionality of either the one-house disapproval or the Iranian-related regulation could not have been tested during administrative deportation proceedings, neither matter should be reviewable directly by a court of appeals under section 106(a).
 
 
 26
 The court in Chadha attempts to justify its broad reading of the language of section 106(a) on four grounds. First, it relies on precedent. Specifically, the court focuses on Waziri v. Immigration and Naturalization Serv., 392 F.2d 55 (9th Cir. 1968), which held that "section 106 included the power to review 'logical predicates' to deportation orders that are 'integrally related' to and interdependent with the final order," Chadha, supra, at 412.[19] Waziri, however, predates Cheng Fan Kwok by a number of months. More important, the Waziri opinion cannot be reconciled with the later Supreme Court case, essentially for the same reason as mentioned above: Waziri, like Chadha, but unlike Cheng Fan Kwok, would permit a court of appeals to void a deportation order resulting from an invalid determination made outside of the section 242(b) process.[20]
 
 
 27
 Second, the Chadha court asserts that its broad reading of section 106(a) is not incompatible with Cheng Fan Kwok. In Cheng Fan Kwok the Supreme Court concluded that "Congress quite deliberately restricted the application of § 106(a) to orders entered during proceedings conducted under § 242(b), or directly challenging deportation orders themselves." Cheng Fan Kwok, supra, 392 U.S. at 215, 88 S.Ct. at 1975 (emphasis added). Relying on this latter clause, Chadha reaches a sweeping conclusion: "As the validity of the final deportation order is contingent upon the validity of the congressional action under section 244(c)(2), Chadha is very clearly 'directly challenging (the) deportation order (itself),' ... and thus jurisdiction exists under section 106." Chadha, supra, at 413. We respectfully disagree with such an interpretation of the "directly challenging" language in Cheng Fan Kwok. We fail to see why, under Chadha's reading of that phrase, an alien in Cheng's position would not similarly be able to assert that because "the validity of (his) final deportation order is contingent upon the validity of" the INS decision denying him discretionary relief, he "is very clearly 'directly challenging (the) deportation order (itself),' ... and thus jurisdiction exists under section 106." We decline to read the "directly challenging" language in a manner that, sub silentio, strikes at the heart of the Court's holding in Cheng Fan Kwok. Instead, we conclude that the Court, in adding the clause in question, meant only to acknowledge the longstanding notion that an alien, in a petition for review, can challenge the determination of his or her deportability qua deportability; that is, an alien can allege that there does not exist the requisite "reasonable, substantial and probative evidence on the record considered as a whole"[21] to support an administrative factfinding of deportability. Thus, review under section 106(a) extends only to agency factual determinations involving deportability and to any orders entered during the deportation proceeding itself. See Note, Jurisdiction to Review Prior Orders and Underlying Statutes in Deportation Appeals, supra, at 416-17.
 
 
 28
 Third, Chadha justifies its broad reading of section 106(a) as consonant with congressional intent " 'to expedite the deportation of undesirable aliens by preventing successive dilatory appeals to various federal courts,' " Chadha, supra, at 413-14, quoting Foti, supra, 375 U.S. at 226, 84 S.Ct. at 312. We agree that, in enacting section 106(a), Congress was motivated primarily by a desire to eliminate repetitive and groundless federal appeals.[22] Moreover, we admit that, given our decision today, "cases where both deportability and the INA are challenged (may) require one hearing in the court of appeals on deportability and, if all appeals are taken, potentially three other hearings in the federal court system on the constitutional challenge." Chadha, supra, at 414. Such a result necessarily follows from a finding of no jurisdiction, as the Supreme Court recognized in Cheng Fan Kwok, supra, 392 U.S. at 217, 88 S.Ct. at 1976. Nonetheless, we do not believe that, for reasons of judicial economy, we should alter our interpretation either of section 106(a) or of the Supreme Court's holding in Cheng Fan Kwok. The possibility of review of a constitutional question in both a district court and a court of appeals is not an "onerous burden," particularly in light of the fact that such multi-tiered constitutional review is the norm in our judicial system. More important, "it is the result that we believe most consistent both with Congress' intentions and with the terms by which it has chosen to express those intentions," Cheng Fan Kwok, supra, at 217-18, 88 S.Ct. at 1976-77.
 
 
 29
 Finally, Chadha concludes that, in light of Riva 's holding that a district court is precluded from considering constitutional objections to the Immigration and Nationality Act, a court of appeals is bound to entertain such objections lest aliens subject to deportation never be able to raise them. Chadha, supra, at 414-15. We are unable to reconcile this assertion with the Chadha court's earlier contention that, if courts of appeals decline to exercise jurisdiction over the constitutional claims of alien-petitioners, "potentially three other hearings in the federal court system on the constitutional challenge" would result, Chadha, supra, at 414. In any event, we are not persuaded that, in the future, aliens in the same position as petitioners will be unable to attack the constitutionality of the Act in any other forum. On the contrary, "(i)n situations to which the provisions of § 106(a) are inapplicable, the alien's remedies would, of course, ordinarily lie first in an action brought in an appropriate district court," Cheng Fan Kwok, supra, 392 U.S. at 210, 88 S.Ct. at 1973. District courts remain open to individuals seeking declaratory and injunctive relief from allegedly unconstitutional statutes.[23]
 
 
 30
 In sum, unlike the court in Chadha, we cannot read section 106(a) to encompass attacks on the constitutionality of a statute or a regulation underlying an alien's deportation order. Thus, we decline to consider the merits of petitioners' first contention in this appeal.[24]
 
 
 31
 Petitioners' second argument, that the INS abused its discretion and violated due process by "mechanically" denying discretionary relief to Iranian nonimmigrant students, parallels a contention rejected on jurisdictional grounds in Andres v. Immigration and Naturalization Serv., 460 F.2d 287 (6th Cir. 1972). In Andres, an alien whose third preference teaching visa was not revalidated by the INS challenged that decision as a denial of due process. Additionally, the alien averred that the Secretary of Labor acted arbitrarily in promulgating the regulation upon which the INS decision was based. The court, citing Cheng Fan Kwok, dismissed the petition because "the issues raised by petitioner turn on matters collateral to the entry of the deportation order under § 1252(b)," and therefore were not within the jurisdiction of a court of appeals under section 106(a). Andres, supra, at 288.[25]
 
 
 32
 The discretion argument advanced by petitioners on this appeal, as in Andres, is "collateral" in that it amounts to neither a direct challenge to petitioners' "final orders of deportation" nor an attack upon an order "entered during proceedings conducted under § 242(b)." To be sure, it can be argued that, had the INS exercised some sort of discretion with respect to Iranian nonimmigrant students, the deportation orders for petitioners might never have been issued. But, as we observed in disposing of the constitutional claim above, Cheng Fan Kwok does not permit appellate court jurisdiction over administrative decisions unconnected to the deportability determination. Quite simply, the INS decisions attacked here were not made in the course of a deportation proceeding and hence, according to Cheng Fan Kwok, may not be asserted before a court of appeals conformably with section 106(a). Moreover, it should be noted that petitioners' claim here raises complicated questions of fact that cannot be resolved on the basis of the barren record made available to us in this case.[26] The proper forum for compilation of such a record, as well as for initial determination of the abuse of discretion argument, lies in the appropriate district court.
 
 
 33
 Petitioners' final contention that the INS violated past practices and operating instructions when it refused to overlook petitioners' visa and transfer infractions and reinstate them to nonimmigrant student status can be disposed of quickly, in light of the above discussion.[27] Decisions by INS district directors relating to visa extensions or to school transfers cannot be appealed to an Immigration Judge or to the Board of Immigration Appeals. See 8 C.F.R. § 214.2(f)(7) (1981). Thus, the granting of such discretionary relief is a determination made wholly independent of and apart from any deportation proceeding involving an alien. Once again, Cheng Fan Kwok bars review by a court of appeals of petitioners' assertions. See Butterfield v. Immigration and Naturalization Serv., 409 F.2d 170, 173 (D.C.Cir.1969).
 
 IV.
 
 34
 We conclude that we have no jurisdiction under section 106(a) of the Immigration and Nationality Act to consider the claims advanced by petitioners on this appeal. Accordingly, we dismiss without prejudice these petitions for review.
 
 
 
 [1]
 8 U.S.C. § 1103(a) directs the Attorney General to establish such regulations as he deems necessary for carrying out his authority under the Act; 8 U.S.C. § 1184(a) directs him to prescribe the time and conditions for admission of nonimmigrant aliens; and 8 U.S.C. § 1251(a)(9) authorizes him to order the deportation of nonimmigrant aliens who fail to maintain their status or to comply with the conditions of that status
 
 
 [2]
 Regulation 214.5, 8 C.F.R. § 214.5 (1979), reads in full:
 (a) An alien admitted as an F-1 or J-1 nonimmigrant student to attend a post-secondary school, including a vocational school, who is a native or citizen of Iran must report to the INS District Office or suboffice having jurisdiction over his or her school or to an INS representative on campus on or before December 31, 1979, and provide information as to residence and maintenance of nonimmigrant status. Each student must have in his or her possession at the time of reporting:
 (1) Passport and Form I-94;
 (2) Evidence from the school of enrollment and payment of fees or waiver of payment of fees for the current semester;
 (3) A letter from school authorities attesting to the course hours in which presently enrolled and the fact that the student is in good standing; and
 (4) Evidence of current address in the United States. Students must provide such other information as INS may request in order to verify maintenance of status and residence.
 (b) Failure by a nonimmigrant student to comply with the provisions of paragraph (a) of this section or willful provision of false information to the INS will be considered a violation of the conditions of the nonimmigrant's stay in the United States and will subject him or her to deportation proceedings under Section 241(a)(9) of the Act.
 (c) A condition of the admission and continued stay in the United States of a nonimmigrant covered by paragraph (a) of this section is obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed, (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status under Section 241(a)(9) of the Act.
 The foregoing actions are taken in accordance with the Presidential directive of November 10, 1979, issued in the course of, and in response to, the international crisis created by the unlawful detention of American citizens in the American Embassy in Tehran. Accordingly, the notice and comment and delayed effective date provisions of Section 553 of Title 5 of the United States Code are hereby waived as impracticable and contrary to the public interest.
 
 
 [3]
 Section 241(a) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a), provides in relevant part:
 Any alien in the United States ... shall, upon the order of the Attorney General, be deported who ... (9) was admitted as a nonimmigrant and failed to maintain the nonimmigrant status in which he was admitted ... or to comply with the conditions of any such status.
 
 
 [4]
 According to Petitioners' Consolidated Brief, at 6-8, Dastmalchi, a native and citizen of Iran, entered the United States on July 31, 1976, as an F-1 nonimmigrant student to attend the State University of New York at Binghamton, with an authorized stay to July 30, 1977, later extended for one year. Dastmalchi subsequently transferred to Scranton University and then to West Virginia University. Neither transfer was approved in advance by the INS, as required by 8 C.F.R. § 214.2(f)(4). In addition, Dastmalchi failed timely to apply to the INS to extend his stay past July 29, 1978
 
 
 [5]
 Saliminia, a native and citizen of Iran, entered the United States on July 9, 1979, as an F-1 nonimmigrant student destined for North Texas State University. Saliminia subsequently transferred to Gannon University in Erie, Pennsylvania, and sought approval of the transfer by submitting an I-538 form in September 1979. Saliminia apparently sent the form to the wrong school, however, for it was returned to him unexecuted. Shortly thereafter, the Iranian crisis erupted. Saliminia contacted the INS about his problem and was advised to explain the situation at his Regulation 214.5 interview. At that interview, however, an Immigration Officer found Saliminia to be out of status, and an order to show cause was issued, charging him with violation of 8 U.S.C. § 1251(a)(9). Saliminia's March 12, 1980, Application for Reconsideration, which included an INS form I-538 requesting retroactive permission to transfer schools, was denied without explanation. Petitioners' Consolidated Brief, at 11-14
 
 
 [6]
 Tarassoly, also a native and citizen of Iran, was issued a visa authorizing him to attend Shippensburg State College in Pennsylvania until September 3, 1979. Tarassoly subsequently transferred to Gannon University without the prior permission of the INS. In November 1978 Tarassoly submitted an I-538 form requesting permission to engage in practical training at Gannon. Such permission was granted by the INS on December 6, 1978, but we are unable to determine from petitioner's account whether Tarassoly's transfer to Gannon also was approved by the INS at that time. Shortly after his stay expired, Tarassoly requested extension from the INS. His application was returned on October 24, 1979, for clarification as to where he was attending school. When Tarassoly reported pursuant to Regulation 214.5 and tendered an updated I-538 form, an order to show cause was issued, alleging that he had violated both 8 U.S.C. §§ 1251(a)(2) and (a)(9). Tarassoly's updated I-538 was denied on December 10, 1979, and his Application for Reconsideration was rejected on January 24, 1980. Petitioners' Consolidated Brief, at 8-11
 
 
 [7]
 Petitioners' Consolidated Brief, at 18. Such discretionary relief includes the noninstitution, suspension, or cancellation of deportation proceedings, the granting of voluntary departures in lieu of deportation, the adjustment of an alien's status, and the withholding of deportation. See generally 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure §§ 7.1-.12 (rev. ed. 1981)
 
 
 [8]
 In advancing this abuse of discretion argument, petitioners rely primarily on United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Wong Wing Hang v. Immigration and Naturalization Serv., 360 F.2d 715 (2d Cir. 1966); Mastrapasqua v. Shaughnessy, 180 F.2d 999 (2d Cir. 1950); and Lennon v. United States, 387 F.Supp. 561 (S.D.N.Y.1975)
 
 
 [9]
 The January 4, 1980, instruction, entitled "Iranian Project IR. 42," reads in relevant part:
 As you know we have been successful in the Court of Appeals relative to the case of the Iranian students, and that the program is proceeding as scheduled. You are reminded that the Service should continue to consider the humanitarian aspects in all of the cases. Accordingly, all Iranian students who reported during the time period and who are out of status should be treated in the same manner as students of all other nationalities with respect to the question of reinstatement of nonimmigrant student status. Any case in which an Iranian student was not given the same consideration for reinstatement as students of other nationalities should be referred back to the District Director for reconsideration. Regional Commissioners should contact all District Directors to insure that there is no disparity between Districts in the treatment of all student cases....
 
 
 [10]
 Petitioners' Consolidated Brief, at 28. Cf. 1A C. Gordon & H. Rosenfield, supra, § 4.9, at n.17 ("students who have quit school and are found out of status often are permitted to resume their student status, if a bona fide desire to complete their studies is demonstrated")
 
 
 [11]
 Section 242(b) of the Act, 8 U.S.C. § 1252(b), reads in part:
 "A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and, as authorized by the Attorney General, shall make determinations, including orders of deportation." The statute sets forth certain procedural rules to be followed in determining the deportability of an alien and provides that "no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence."
 
 
 [12]
 Compare Blagaic v. Flagg, 304 F.2d 623 (7th Cir. 1962) and Waziri v. Immigration and Naturalization Serv., 392 F.2d 55 (9th Cir. 1968) with Cheng Fan Kwok v. Immigration and Naturalization Serv., 381 F.2d 542 (3d Cir. 1967), aff'd, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968) and Tai Mui v. Esperdy, 371 F.2d 772 (2d Cir. 1966), cert. denied, 386 U.S. 1017, 87 S.Ct. 1372, 18 L.Ed.2d 454 (1967). See generally C. Gordon & H. Rosenfield, supra, at § 8.9A; Note, Judicial Review of Final Orders of Deportation, 42 N.Y.U.L.Rev. 1155 (1967)
 
 
 [13]
 As one commentator has observed, "According to the Court, section 106(a) jurisdiction mechanically mirrors the section 242(b) hearing.... Inclusion in the section 242(b) hearing, rather than logical relationship or practical effect, appears to be the critical determinant of section 106(a) jurisdiction." Note, Jurisdiction to Review Prior Orders and Underlying Statutes in Deportation Appeals, 65 Va.L.Rev. 403, 415 (1979)
 
 
 [14]
 See Matter of Cortez, 16 I. & N. Dec. 289, 291 n.2 (BIA 1977); Matter of Chery and Hasan, 15 I. & N. Dec. 380, 382 (BIA 1975) ("neither this Board nor the immigration judge may rule on the constitutionality of the statutes which we administer"); Matter of Tzimas, 10 I. & N. Dec. 101, 102 (BIA 1962) (immigration-related regulation issued by Attorney General "is binding upon the Board"); Matter of M, 9 I. & N. Dec. 132, 138 (BIA 1960) (citing Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803)); Matter of L, 4 I. & N. Dec. 556, 557 (BIA 1951)
 
 
 [15]
 See Chadha v. Immigration and Naturalization Serv., 634 F.2d 408, 411-15 (9th Cir. 1980); Hernandez-Rivera v. Immigration and Naturalization Serv., 630 F.2d 1352, 1355-56 (9th Cir. 1980); Rubio de Cachu v. Immigration and Naturalization Serv., 568 F.2d 625, 627 (9th Cir. 1977); Pilapil v. Immigration and Naturalization Serv., 424 F.2d 6, 9 (10th Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 752, 27 L.Ed.2d 147 (1970). For similar district court decisions, see Shodeke v. Attorney General of United States, 391 F.Supp. 219, 221 (D.D.C.1975); Riva, supra
 In passing, we note that other courts apparently have addressed constitutional claims raised by aliens challenging deportation orders without ever considering whether jurisdiction existed under section 106(a) in the first place. For example, in Malek-Marzban v. Immigration and Naturalization Serv., 653 F.2d 113 (4th Cir. 1981), the Court of Appeals for the Fourth Circuit entertained a constitutional challenge to 8 C.F.R. § 244.1 (establishing a specific time limit for voluntary departures, applicable only in deportation cases involving Iranian nationals) presented directly to it in a petition for review of a deportation order. The court rejected the constitutional attack, without referring to or discussing any jurisdictional questions. See also Menezes v. Immigration and Naturalization Serv., 601 F.2d 1028, 1032-35 (9th Cir. 1979) (upholding constitutionality of section 214(d) of Immigration and Nationality Act; no discussion of jurisdiction); Francis v. Immigration and Naturalization Serv., 532 F.2d 268 (2d Cir. 1976) (holding section 212(c) of Act unconstitutional; no discussion of jurisdiction).
 
 
 [16]
 For example, Chadha cites Hernandez-Rivera, Rubio de Cachu, Pilapil, Shodeke, and Riva, among other cases; Rubio de Cachu and Riva, in turn, cite Pilapil; Shodeke relies on Riva and Pilapil. The Pilapil opinion itself is based exclusively on Ferrante v. Immigration and Naturalization Serv., 399 F.2d 98 (6th Cir. 1968), which was handed down a number of months before Cheng Fan Kwok and which held that "initial jurisdiction exists in the Court of Appeals to review actions or decisions of the Immigration Service, which if decided in favor of the petitioner would have the effect of nullifying outstanding deportation orders," id., at 103
 
 
 [17]
 See Note, Jurisdiction to Review Prior Orders and Underlying Statutes in Deportation Appeals, supra, at 411 ("These cases establish the exclusive jurisdiction of the courts of appeals over constitutional challenges to underlying statutes primarily by citing one another and never reconcile with Ferrante, their 'foundation case,' Cheng Fan Kwok "). Cf. Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 67 (1960) ("There are places in the law through which a pair of mutually oblivious doctrines run in infinitely parallel contrariety, like a pair of poolhall scoring racks on one or the other of which, seemingly at random, cases get hung up")
 
 
 [18]
 On the merits, in a potentially far-reaching decision, the court held that the procedure set forth in section 244(c)(2) violates the separation of powers by unconstitutionally intruding on executive and judicial authority. Chadha, supra, at 420-36. See Nathanson, Separation of Powers and Administrative Law: Delegation, the Legislative Veto, and the "Independent" Agencies, 75 Nw. U.L.Rev. 1064, 1087 n.72 (1981)
 
 
 [19]
 The Waziri court acknowledged that the specific INS order challenged a recission of permanent resident status entered pursuant to section 246 of the Act was not "literally" within the scope of section 106(a) since a section 242(b) proceeding was not involved. Moreover, it observed, Waziri did not contest the "technical correctness" of his resulting deportation order. Nonetheless, the court concluded that appellate level jurisdiction could be grounded on the practical "interdependency" of the two INS orders: "section 106(a)'s objective of expedition would be thwarted if this court approved perfunctorily the deportation order while the district court reviewed the crucial underlying recission order, and afterward this court reviewed on appeal the determination of the district court." Waziri, supra, at 56-57. Compare Cheng Fan Kwok, supra, at 217, 88 S.Ct. at 1976. ("The result we reach today will doubtless mean that, on occasion, the review of denials of discretionary relief will be conducted separately from the review of an order of deportation involving the same alien. Nonetheless, this does not seem an onerous burden ...")
 
 
 [20]
 See K. Davis, Administrative Law Treatise § 23.03, at 798 (Supp.1970) ("Reconciling (Waziri), with the Supreme Court's statement of its holding in Cheng Fan Dwok (sic) five months later may be difficult")
 
 
 [21]
 Section 106(a)(4) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a)(4), provides that
 except as provided in clause (B) of paragraph (5) of this subsection (involving a genuine issue of material fact as to a petitioner's nationality), the petition shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial and probative evidence on the record considered as a whole, shall be conclusive.
 
 
 [22]
 In addition, there is some evidence, albeit marginal, that Congress was concerned about the proliferation of ill-founded attacks upon the constitutionality of the Immigration and Naturalization Act. See (1961) U.S.Code Cong. & Ad.News 2950, 2967; H.R.Rep.No.565, 87th Cong., 1st Sess. 2, 11 (1961). Nonetheless, we are bound by the Supreme Court's reading of this same legislative history in Cheng Fan Kwok. "This is concededly 'a choice between uncertainties,' but we are 'content to choose the lesser.' " Cheng Fan Kwok, supra, 392 U.S. at 215, 88 S.Ct. at 1975
 
 
 [23]
 In Narenji v. Civiletti, 617 F.2d 745 (D.C.Cir.1979), the Court of Appeals for the District of Columbia upheld the constitutionality of Regulation 214.5. It is instructive to note that the constitutional claims addressed in Narenji first were made in the district court in an action for declaratory and injunctive relief, Narenji v. Civiletti, 481 F.Supp. 1132 (D.D.C.1979). Cf. Yassini v. Crosland, 618 F.2d 1356 (9th Cir. 1980) (constitutional attack on INS directive relating to revocation of deferred departure dates for Iranian nationals before court of appeals on appeal from decision of district court); Acosta v. Gaffney, 558 F.2d 1153 (3d Cir. 1977) (district court had jurisdiction to review constitutional challenge by child to parents' deportation order); Papakonstantinou v. Civiletti, 496 F.Supp. 105, 107 (E.D.N.Y.1980) (district court has jurisdiction to entertain attacks on constitutionality of INA)
 
 
 [24]
 Even were we to conclude that we had jurisdiction under section 106(a) to consider the constitutional attack, and even were we then to decide that the President's proclamation and Regulation 214.5 were in fact unconstitutional, it is not at all clear that the deportability of the petitioners in this case would be affected, given that they were, as they acknowledge, out of status with applicable immigration-related statutes and regulations. In Katris v. Immigration and Naturalization Serv., 562 F.2d 866 (2d Cir. 1977), for example, the court held that, where an alien admitted his illegal status at his deportation hearing, the illegality of the arrest that brought him before the INS was not relevant
 
 
 [25]
 Compare Marcello v. Attorney General of United States, 495 F.2d 171, 173-74 (D.C.Cir.1974), which held that a district court lacked jurisdiction under the Administrative Procedure Act to enjoin or invalidate INS administrative decisionmaking, since such judicial review is committed solely to courts of appeals pursuant to section 106(a). Significantly, in reaching this conclusion, the Marcello court relied upon Foti and Giova, but failed to cite or to discuss Cheng Fan Kwok and Andres
 
 
 [26]
 For example, even were we to reach the merits in this case, we would be unable to determine from the record whether, and if so, how the Iranian cases were handled differently from other student cases, aside from the obvious fact that the INS did not discover these infractions based on its own information but instead encountered them as a result of the implementation of Regulation 214.5. Similarly, we would be unable to assess the significance of the January 4, 1981, "curative" memorandum issued by the INS. The record does not establish to whom the instruction was issued, why it should be considered "curative" in nature, and in what sense it was "totally disregarded," Petitioners' Consolidated Brief, at 30, by the Pittsburgh INS office
 
 
 [27]
 Petitioners rely primarily on Mashi v. Immigration and Naturalization Serv., 585 F.2d 1309 (5th Cir. 1978), where the court reasoned that, in light of courts' "pro-alien, anti-deportation policy of statutory interpretation responsive to Congress's intent to encourage 'cultural interchange,' " the INS should "loo(k) into each case (involving a nonimmigrant student) on its own facts, and decid(e) by striking a fair balance between the character of the act committed and the consequences which will flow from it," id., at 1315, 1317. Consequently, the court in Mashi reversed a deportation order issued to a nonimmigrant student because the facts demonstrated that he was not out of compliance with the conditions of his status, and therefore was not in violation of 8 U.S.C. § 1251(a)(9). Here, however, petitioners do not contend that the INS incorrectly determined that they had violated their status due to overstays or unauthorized transfers; rather, they urge that, in spite of their "technical" violations, they should be restored to nonimmigrant student status. Mashi does not stand for such a proposition